**STATE of Tennessee, Appellee,**

v.

**Tony Alois MAKOKA, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

May 19, 1994.

Permission to Appeal Denied by Supreme Court Sept. 12, 1994.

Charles W. Burson, Atty. Gen. & Reporter, Christina S. Shevalier, Asst. Atty. Gen., Nashville, Guy R. Datsun, Dist. Atty. Gen., and William C. Whitesell, Jr., Asst. Dist. Atty. Gen., Murfreesboro, for appellee.

Karen H. Hornsby, Asst. Public Defender, Murfreesboro (appeal only) and Richard McGee, Nashville (trial only), for appellant (Gerald L. Melton, Dist. Public Defender, Murfreesboro, of counsel).

## OPINION

JONES, Judge.

The appellant, Tony Alois Makoka, was convicted of an attempt to commit murder in the first degree, a Class A felony and an attempt to commit murder in the second degree, Class B felony, by a jury of his peers. The trial court found that the appellant was a standard offender and imposed the following Range I sentences:

a) confinement for twenty-five (25) years in the Department of Correction for the offense of attempt to commit murder in the first degree; and

b) confinement for twelve (12) years in the Department of Correction for the offense of attempt to commit murder in the second degree.

The sentences are to be served concurrently.

Four issues are presented for review. The appellant contends that the evidence contained in the record will not support a finding by a rational trier of fact of guilt beyond a reasonable doubt of attempt to commit murder in the first degree because the state failed to prove the elements of premeditation and deliberation. He further contends that (a) his statement to law enforcement officers was obtained through a material misrepresentation, (b) the trial court erred in failing to instruct the jury on the element of deliberation as defined in State v. Brown,[1] and (c) the trial court improperly weighed the mitigating and enhancement factors when imposing the maximum sentence in both cases.

The judgment of the trial court is affirmed as modified.

The appellant resided in Nashville with his wife and young daughter. He commuted to Smyrna where he was employed as a chemist. Jane Rhodes, one of the victims, worked for the same company.

The appellant and Rhodes met at their place of employment in the spring of 1990, and they began to date. Eventually, they fell in love and became constant companions. However, their relationship was stormy at times.[2] On several occasions Rhodes attempted to terminate the relationship. The appellant told her that if she did not see him, he would kill himself. He continually pleaded with Rhodes to return to their relationship. She relented on each occasion; and the relationship continued.

Rhodes left her employment when she obtained a position with another company. She subsequently terminated her relationship with the appellant. As in the past, he constantly asked Rhodes to reconsider. In December of 1991, the appellant attended a Rhodes family Christmas party. Members of the Rhodes family, not Jane Rhodes, invited him to the party. He told Rhodes that if she began dating someone else, he would kill her.

A violent argument occurred on January 2, 1992, while Rhodes and the appellant were talking on the telephone. He subsequently arrived at Rhodes' home, and the argument continued. It ended when Rhodes threw the leather coat that the appellant gave her for Christmas out the front door. Rhodes subsequently called the appellant's wife and told her about the relationship. The appellant's wife became angry; and she told the appellant that he needed to come home immediately. He subsequently called Rhodes and learned that she had called his wife. The appellant called his wife and stated that she was angry because Rhodes had called her.

1. 836 S.W.2d 530 (Tenn.1992).

2. In May of 1991, the appellant cancelled a scheduled trip to Kentucky. Rhodes became angry, called the appellant's wife, and advised her of the relationship Rhodes was having with her husband. In June of 1991, there was a bitter disagreement, their cars collided, and the appellant was arrested.

Rhodes worked the second shift, which ended at 5:30 a.m. On January 3, 1992, she planned to spend the weekend with Dwight Cooper, a co-employee and a new boyfriend, at his home in Columbia. However, she wanted to talk with her mother before leaving.

Cooper was driving Rhodes' vehicle enroute to her home. They were travelling the same route Rhodes usually took to and from her place of employment. While proceeding along Thompson Lane in Murfreesboro, a pickup truck began following Rhodes' vehicle. The truck began blinking its headlights. When Rhodes realized that it was the appellant's truck, she told Cooper to drive straight to the police station in Murfreesboro. Since Cooper was not familiar with Murfreesboro, Rhodes told him the route to take.

When Cooper left Thompson Lane near the Veteran's Hospital, the appellant attempted to force Rhodes' vehicle off the roadway. He would pull beside the passenger side of the vehicle, drop back behind the vehicle, and pull beside the driver's side of the vehicle. The appellant fired one shot from his .357 revolver while he was beside the driver's side of the vehicle. The projectile struck Cooper's shoulder. The pursuit continued until Cooper parked the vehicle in front of the Murfreesboro Police Department, exited the vehicle, and ran towards the station. The appellant, who stopped his truck, fired two shots at Cooper.

When Rhodes saw that the appellant was on the passenger side of the vehicle, she attempted to exit the vehicle through the door on the driver's side. As she was exiting the vehicle, the appellant shot her in the buttocks. Rhodes collapsed in front of the police station, and the appellant shot her in the chest as she lay on the ground. As a direct and proximate result of the gunshot wounds, Rhodes underwent six surgical procedures, a kidney was removed, and she needs additional medical treatment.

The appellant did not testify in support of his defense. His wife testified that she con-fronted the appellant following Rhodes' telephone call. It appears that they reconciled their differences; and the appellant planned to see Rhodes the following morning. When the appellant left the apartment at 5:00 a.m. on the morning of January 3, 1992, he was in good spirits.

A psychiatrist hospitalized the appellant after he was released from jail. He was placed on a suicidal watch at the hospital. The psychiatrist testified that in his opinion the appellant "did not and could not have committed a premeditated act of that nature [the shooting]." The doctor further testified that the appellant gave "the impression of being a passive and compliant, a non-assertive, rather dependent individual." He concluded by saying: "I think it was a spontaneous act that was not based on the idea that he wished to harm them or take their lives or render them any harm in any way." He defined a spontaneous act as one "done without thinking and without planning."

The assistant district attorney general successfully impeached the doctor. He admitted that he had not examined the appellant to determine whether he was insane when he shot the victims or to determine if the appellant was competent to stand trial. Moreover, the doctor admitted that he did not consider the facts surrounding the shooting in reaching his opinion. He also admitted that his opinion was predicated solely on the "nature of [the appellant's] personality."[3] In short, the opinions expressed by the doctor were not predicated upon medical findings. A layman, who knew the appellant, could relate these same conclusions based upon his or her observation of the appellant over a period of time.

## I.

### A.

■ When an accused challenges the sufficiency of the convicting evidence, this Court must review the record to determine if the evidence adduced at the trial is sufficient "to

---

3. The doctor subsequently stated: "I gave an opinion regarding the motivation he may have had for committing the act. *I have no knowledge of his state of mind*" (emphasis added). He also stated during cross-examination: "[H]e's not the kind of person who would do that sort of thing based on what I know about his personality makeup."

support the finding by the trier of fact of guilt beyond a reasonable doubt."[4] This rule is applicable to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence.

■ In determining the sufficiency of the evidence, this Court does not reweigh or reevaluate the evidence.[5] Nor may this Court substitute its inferences for those drawn by the trier of fact from circumstantial evidence.[6] To the contrary, this Court is required to afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence.[7]

■ Questions concerning the credibility of the witnesses, the weight and value to be given to evidence, and all factual issues raised by the evidence are resolved by the trier of fact, not this Court.[8] In *State v. Grace*,[9] our Supreme Court said: "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."

■■ Since a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdicts returned by the trier of fact.[10] This Court will not disturb a verdict of guilt due to the sufficiency of the evidence unless the facts contained in the record and any inferences which may be drawn from the facts are insufficient, as a matter of law, for a rational trier of fact to find the accused guilty beyond a reasonable doubt.[11]

**B.**

■ When the appellant left the apartment enroute to Murfreesboro on the morning of January 3, 1992, he had reconciled with his wife; and he was not depressed or suicidal that morning. There is nothing to suggest that he was angry or that passion blurred his vision.

The evidence is uncontradicted that the appellant went to Murfreesboro to confront Rhodes, he pursued Rhodes' vehicle when Cooper and Rhodes refused to stop, he fired a shot through his window into Rhodes' vehicle, and he followed the vehicle several miles enroute to the police station. There the appellant attempted to make good his threat, namely, if Rhodes began dating another person, he would kill her. He fired two shots at Cooper as Cooper ran toward the entrance to the police station. He shot Rhodes in the buttocks as she was exiting her vehicle, and he shot her in the chest as she lay on the ground in front of the police station.

The facts contained in the record are sufficient to support a finding by a rational trier of fact that the appellant was guilty of attempting to commit murder in the first degree and attempting to commit murder in the second degree beyond a reasonable doubt.[12] The jury was warranted in finding that the elements of murder in the first degree were proven by the state and that the appellant attempted to kill Rhodes. The appellant does not challenge his conviction for attempting to commit murder in the second degree.

This issue is without merit.

**II.**

The appellant was arrested on the grounds of the police department shortly after he shot Rhodes. He was handcuffed and taken to the basement of the station. A detective was

---

4. Tenn.R.App.P. 13(e).

5. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim.App.1990).

6. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956).

7. *State v. Cabbage*, 571 S.W.2d 832, 835 (1978).

8. *State v. Cabbage*, 571 S.W.2d at 835.

9. 493 S.W.2d 474, 476 (Tenn.1973).

10. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

11. *State v. Tuggle*, 639 S.W.2d at 914.

12. Tenn.R.App.P. 13(e). *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979).

notified at home; and he came to the station. When the detective arrived, he talked to some of the officers to determine what transpired. He then took the appellant to an interrogation room located in the detective suite of offices.

The detective advised the appellant of his rights. The appellant executed a waiver form. The detective talked with the appellant briefly before tape recording the appellant's statement. The appellant advised the detective that Cooper had fired a shot at him. The appellant gave the detective a statement that described the encounter on Thompson Lane and the chase.

The appellant contends that his statement was obtained through the misrepresentations of the detective. He argues that the officer told him he was not under arrest prior to making the statement; and that the investigation was focused on another person, Cooper. The statement reveals the following colloquy:

Q. State your name for me for the record?

A. Tony Makoka.

Q. Tony, just a few moments ago, I advised you of your rights by letting you read the definition and waiver form that you signed showing that you understood your rights, is that correct?

A. Yes.

Q. I'm going to read them to you again, for the record to be sure you understand them. O.K. Before I ask any questions you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish one. If you decide to answer any questions now, without a lawyer present, you will still have the right to stop answering at any time until you talk to a lawyer. Do you understand all those rights.

A. Yes.

Q. Now this doesn't mean you're being arrested, cause at this point I don't know what you've done if anything, or what's going on, but in order to protect you, that's why I'm advising you of your rights. All I know from what we discussed a while ago is that somebody shot at you this morning.

A. Yes.

The appellant told the detective that he met Rhodes' vehicle by coincidence—he was enroute to her home. He admitted that he pulled beside Rhodes' vehicle so she could see he was driving the truck. The appellant related that Cooper shot at him; and he heard the bullet strike metal. When he arrived at the police station, he thought that Cooper was going to shoot at him again. He shot at Rhodes' vehicle—he did not shoot at Rhodes. He denied firing at the vehicle after the chase ensued.

The detective emphatically denied that he attempted to deceive the appellant so he could obtain a statement from him. The detective had not talked to either Cooper or Rhodes before talking to the appellant. As the detective stated at the suppression hearing: "I didn't know his side of it. He might have been doing something that could have been looked at a different way." Later, officers went to the area where the appellant stated Cooper had thrown the weapon and searched the area thoroughly. The officers did not find a weapon. Nor did the officers find where a bullet had struck the appellant's truck.

The appellant did not present any evidence at the suppression hearing.

The trial court denied the appellant's motion to suppress. In ruling, the court said: "Proper admonition and waiver here under *Miranda*, and I cannot find, based on this statement, that there is an affirmative misrepresentation presented by this detective to this individual that gives rise to the statement. The motion to suppress is overruled."

When an accused is afforded an evidentiary hearing on the merits of a motion to suppress a statement given to law enforcement officials, the factual findings of the trial court have the weight of a jury verdict. Consequently, the findings of fact made by the

trial court are binding upon this Court unless the evidence contained in the record preponderates against these findings.[13] In this case, the evidence adduced at the suppression hearing does not preponderate against the findings of the trial court. Thus, the judgment of the trial court denying the motion to suppress must be affirmed.

This issue is without merit.

### III.

■ The appellant contends that the trial court failed to instruct the jury as to the specific element of deliberation as defined in *State v. Brown*.[14] He argues that Tennessee Pattern Jury Instructions (Criminal) § 7.01 (2d ed. 1988), which the trial court included in the charge, is "vague and [does] not give adequate guidance to the jury considering a conviction for first degree murder."

Contrary to the appellant's contention, the instructions given by the trial court were full and complete. Furthermore, the instructions contained an adequate explanation of each element that must be present before an accused can be convicted of murder in the first degree.

The Supreme Court's decision in *Brown* does not require a more definitive explanation of "deliberation" than given by the trial court. *Brown* held that the phrase "premeditation may be formed in an instance" should be deleted from the instructions given in first degree murder cases. The instructions given did not include this phrase.

This issue is without merit.

### IV.

The appellant contends that the trial court abused its discretion in sentencing him to the maximum sentences authorized by the Tennessee Criminal Sentencing Reform Act of 1989. He argues that the trial court erroneously applied certain enhancement factors, refused to consider certain mitigating factors, and failed to give proper consideration to the mitigating factors found in determining the sentences in this case.

### A.

■ When an accused challenges the length of the sentences imposed by the trial court, it is the duty of this Court to conduct a *de novo* review of the record with a presumption that "the determinations made by the court from which the appeal is taken are correct."[15] However, there are exceptions to this requirement. First, the requirement that this Court presume the determinations made by the trial court are correct is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances."[16] Second, the presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused.[17] Third, the presumption does not apply when the determinations made by the trial court are predicated upon uncontroverted facts or a document, such as the presentence report.[18]

In conducting a *de novo* review of a sentence, this Court must consider: (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating and enhancing factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation.[19]

---

13. *State v. Bobo*, 727 S.W.2d 945, 948 (Tenn.), *cert. denied*, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987); *State v. O'Guinn*, 709 S.W.2d 561, 565–566 (Tenn.), *cert. denied*, 479 U.S. 870, 107 S.Ct. 244, 93 L.Ed.2d 169 (1986).

14. 836 S.W.2d 530 (Tenn.1992).

15. Tenn.Code Ann. § 40–35–401(d).

16. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

17. *State v. Bonestel*, 871 S.W.2d 163 (Tenn.Crim. App.1993).

18. *State v. Bonestel, supra.*

19. *See* Tenn.Code Ann. §§ 40–35–103 and –210(b); *State v. Scott*, 735 S.W.2d 825, 829 (Tenn.Crim.App.1987).

When the accused raises sentencing issues in this Court, the accused has the burden of establishing that the sentences imposed by the trial court were erroneous.[20] In this case, the appellant has the burden of establishing that the trial court (a) erroneously considered certain enhancement factors, (b) failed to consider certain mitigating factors, and (c) failed to properly weigh the mitigating factors supported by the record.

### B.

The trial court found that five enhancement factors were supported by the record. The factors applied by the trial court were: (a) the offense involved more than one victim,[21] (b) the appellant employed a firearm during the commission of the offense,[22] (c) the appellant had no hesitation about committing a crime when the risk to human life was high,[23] (d) the felony committed by the appellant resulted in bodily injury to another person and he had been previously convicted of a felony that resulted in death or bodily injury,[24] and (e) the appellant inflicted personal injuries upon another person during the commission of the offense since he had targeted both of the victims.[25]

The state correctly concedes that the trial court should not have applied enhancement factors (3), the offense involved more than one victim,[26] and (11), the felony committed by the appellant resulted in bodily injury to another person after having been previously convicted of a felony that resulted in death or bodily injury.[27]

The appellant concedes that enhancement factor (9) was properly considered by the trial court. It is undisputed that the appellant employed a firearm in committing the offenses for which he was sentenced.

The appellant argues that enhancement factor (10) is inherent in all offenses of attempted murder. The state argues that this factor is not inherent in this case because other people, employees of the Murfreesboro Police Department, were either outside the building or preparing to exit the building when the appellant began shooting at Cooper and Rhodes.

 The record supports enhancement factor (10). While this Court has consistently held that this factor should not be applied when the only person subject to being injured is the victim, this factor is not inherent, as the state argues, when other people present could have been injured.

When this offense occurred, a shift change was in progress. There were people leaving the police station enroute home. A dispatcher was outside when the shooting occurred. She ducked behind a vehicle. There were two police officers near the front door when the shooting occurred. Consequently, the appellant had no hesitation about committing a crime when the risk to human life was high, namely, to the dispatcher and police officers who were about to exit the building.

The appellant also contends that the trial court should not have applied enhancement factor (12). He argues that this factor was intended to apply when "bystanders not intended to be the target of a defendant's violence are injured or killed." The state contends that this factor was properly applied in considering the appellants sentence. The argument advanced by the state centers on the latter portion of this factor, namely, "the actions of the defendant resulted in the death of or serious bodily injury to a victim." The state concedes that this factor would be limited to the sentence imposed for the of-

---

20. Sentencing Commission Comments to Tenn. Code Ann. § 40–35–401(d); *State v. Ashby,* 823 S.W.2d at 169; *State v. Fletcher,* 805 S.W.2d 785, 786 (Tenn.Crim.App.1991).

21. Tenn.Code Ann. § 40–35–114(3).

22. Tenn.Code Ann. § 40–35–114(9).

23. Tenn.Code Ann. § 40–35–114(10).

24. Tenn.Code Ann. § 40–35–114(11).

25. Tenn.Code Ann. § 40–35–114(12).

26. *See State v. Lambert,* 741 S.W.2d 127, 134 (Tenn.Crim.App.1987).

27. This enhancement factor is not supported by the record. The appellant had never been convicted of a prior offense. For this factor to apply the accused must have a prior conviction for a felony involving the infliction of death or bodily injury.

fense of attempting to commit murder in the first degree.

■ This Court has consistently ruled that this factor should not be considered based upon the injuries sustained by the victim.[28] In these cases, the accused was convicted of either aggravated assault or murder. This same reasoning can be extended to an attempt to commit murder in the first degree and murder in the second degree. A victim of either offense is susceptible to the infliction of serious bodily injury. The only factor that distinguishes the crime of attempting to commit murder in the first degree and murder in the second degree is the victim dying as a result of the injuries inflicted by the accused.

The General Assembly, recognizing the seriousness of these offenses and the susceptibility of the victim to serious injuries, has made attempting to commit murder in the first degree, a Class A felony and attempting to commit murder in the second degree a Class B felony. Consequently, the infliction of serious bodily injury was taken into account in the classification of the offenses. Thus, the consideration of this factor in determining the length of an accused's sentence for attempting to commit murder in the first degree or attempting to commit murder in the second degree would constitute double enhancement for the injuries sustained by the victim.

In summary, the trial court properly applied enhancement factors (9) and (10). The trial court should not have applied enhancement factors (3), (11) and (12) when determining the appellant's sentences.

### C.

The trial court found three mitigating factors. The factors included the lack of a criminal record, remorse, and an excellent work record.[29] The appellant contends that the trial court "ignored the numerous mitigating factors" supported by the record.

However, the only three factors discussed in the appellant's brief are the three mitigating factors found by the trial court. The appellant does not challenge the findings of the trial court in this regard.

The record supports the three mitigating factors considered by the trial court.

### D.

■ The trial court found that the enhancement factors applied "outweigh significantly the mitigating factors advanced by the [d]efendant." This Court agrees that the enhancement factors that are applicable to this case are entitled to much greater weight than the mitigating factors. However, the sentences of the appellant should be reduced. The facts and circumstances surrounding the shootings, the threat made by the appellant, and the life-threatening injuries sustained by Rhodes require the imposition of mid-range sentences.

The sentence imposed for the offense of attempting to commit murder in the first degree should be reduced from twenty-five (25) years confinement to twenty (20) years confinement in the Department of Correction. The sentence imposed for the offense of attempting to commit murder in the second degree should be reduced from twelve (12) years to ten (10) years confinement in the Department of Correction.

WADE and WHITE, JJ., concur.

**28.** *See State v. Jeffrey Allen Partin*, Franklin County No. 01–C–01–9202–CC–00054, 1992 WL 217775 (Tenn.Crim.App., Nashville, September 11, 1992); *State v. Greg Patterson*, Loudon County No. 03–C–01–9106–CR–00180, 1992 WL 104759 (Tenn.Crim.App., Knoxville, May 19, 1992); *State v. Tony Von Carruthers*, Shelby County No. 02–C–01–9102–CR–00019, 1991 WL 147946 (Tenn.Crim.App., Jackson, August 7, 1991).

**29.** *See* Tenn.Code Ann. § 40–35–113(13).