IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

AUGUST SESSION, 1998

FILED

October 21, 1998

Cecil W. Crowson
Appellate Court Clerk

| STATE OF TENNESSEE, | ) | C.C.A. NO. 01C01-9707-CR-00259 |
|---|---|---|
| Appellee, | ) | |
| | ) | DAVIDSON COUNTY |
| V. | ) | |
| | ) | HON. SETH NORMAN, JUDGE |
| HAROLD WAYNE SHAW, | ) | |
| | ) | (SECOND DEGREE MURDER; |
| Appellant. | ) | AGGRAVATED KIDNAPPING) |

FOR THE APPELLANT:

KARL F. DEAN
Metro Public Defender

WENDY S. TUCKER
Assistant Public Defender
(At Trial)

JEFFREY A. DeVASHER
Assistant Public Defender
1202 Stahlman Building
211 Union Street
Nashville, TN 37201
(On Appeal)

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General & Reporter

DARYL J. BRAND
Assistant Attorney General
2nd Floor, Cordell Hull Building
425 Fifth Avenue North
Nashville, TN 37243

VICTOR S. JOHNSON, III
District Attorney General

KIMBERLY HAAS
Assistant District Attorney General
Washington Square
222 Second Avenue North, Suite 500
Nashville, TN 37201-1649

OPINION FILED _____

CONVICTIONS AFFIRMED; SENTENCES REVERSED
AND CASE REMANDED FOR NEW SENTENCING HEARING

THOMAS T. WOODALL, JUDGE

# OPINION

The Defendant, Harold Wayne Shaw, appeals as of right his convictions for second degree murder and aggravated kidnapping in the Davidson County Criminal Court. The trial court sentenced Defendant as a Range II Multiple Offender to thirty-five (35) years on the second degree murder conviction and eighteen (18) years on the aggravated kidnapping conviction. The sentences were ordered to be served consecutively to one another as well as to a prior eight (8) year sentence for a felony drug conviction. Defendant raises the following six issues in this appeal:

> (1) Whether sufficient evidence supported the convictions for second degree murder and aggravated kidnapping;
>
> (2) Whether the trial court erred in disallowing questioning of a victim regarding his claim for victim's compensation;
>
> (3) Whether the trial court erred in admitting testimony regarding Defendant's prior incarceration;
>
> (4) Whether the trial court erred in refusing to declare a mistrial when the State asked a witness if Defendant had been on the Tennessee Bureau of Investigation's "Most Wanted List";
>
> (5) Whether the trial court committed plain error in failing to instruct the jury regarding facilitation of second degree murder as a lesser included offense of premeditated first degree murder; and
>
> (6) Whether the trial court committed various sentencing errors.

After a careful review of the record, we affirm Defendant's convictions, but remand the case to the trial court for resentencing.

On December 29, 1993, at approximately 10:00 p.m., police officers and an ambulance were dispatched to G-Man's Market on Brick Church Pike in Nashville in response to a call that a shooting had occurred. Upon arrival, they found 24-year-old Corey Barbee on the floor, bleeding from several gunshot wounds. Barbee told them that "some dudes got Garland [Brinkley]." The victim was asked if the same men who had taken Garland had shot him, and Barbee responded "yes." He told them that three men in masks had entered the store, fired several shots, and then taken away the owner of the market (Garland Brinkley).

Barbee was taken to Vanderbilt University Hospital, where over the next few days he underwent several surgeries. Fourteen days later, on January 12, 1994, Corey Barbee died of complications from the gunshot wounds to his chest and abdomen.

Garland Brinkley, whose nickname is "G-Man," was the owner of G-Man's Market. About six months earlier, Brinkley was involved in some drug transactions, specifically cocaine, with a man he knew as Harold Moore, but whose name was actually Harold Shaw, the Defendant. Brinkley testified that he and Defendant agreed that Defendant would "front" the cocaine to Brinkley to sell, and then Brinkley would later pay Defendant. The cocaine was actually given to Brinkley by a man named Eric, who Brinkley testified was a "go-between." Brinkley testified that in two such transactions, he gave the drugs to someone else to sell. The proceeds from the drug deals were apparently never given to Brinkley so he in turn never returned any of the proceeds to Defendant. It is not clear from the record as to the total

amount and value of the cocaine in the transactions. At the preliminary hearing, Brinkley said he owed $3,800 for three ounces on the first transaction and $9,000 for 12 ounces on the second deal. However, he told investigators and testified at trial that the deals involved a quarter kilo valued at $27,000.

Brinkley testified that on the morning of December 29, 1993, Defendant telephoned him at the store and demanded that Brinkley turn over his house and his Chevrolet Blazer as payment for the cocaine debt. Defendant claimed that Brinkley owed him $27,000 plus a $5,000 late fee, for a total of $32,000. Later that morning, Defendant came to G-Man's Market and again demanded payment from Brinkley. However, Brinkley refused and Defendant left.

Brinkley testified that later that evening, Corey Barbee, known as "Bruno," was at the store with Brinkley. Barbee and Brinkley had been friends for several years. Barbee would stop by the market and watch television and would sometimes help Brinkley clean the store and close it at night. As they were closing the store on the night of December 29, 1993, the door suddenly flew open and a masked man stepped in and shot Barbee five or six times. Brinkley described the shooter as a black male, about six feet tall and 175 pounds, with a hood over his head in addition to the mask. He was armed with what Brinkley described as a nine millimeter Glock or Beretta. The shooter was followed into the market by two more men. The second man had no mask on his face, but only a hood and sunglasses. Brinkley recognized this man as Harold Moore (Shaw), the Defendant. Defendant was armed with a pistol-grip shotgun. The third man, who was also masked, was shorter and chubbier. According to Brinkley, all three men were black.

After Barbee was shot, Barbee asked to use the phone to call an ambulance. He then managed to get to the phone and call 911 for help. Brinkley testified that the Defendant then ordered Brinkley to leave the market with them. Brinkley said that he initially refused and that the man who had shot Barbee then "shot me and grazed my leg." He testified that the bullet did not enter his leg, but that he has a scar from being grazed. However, there is apparently no medical record of such a graze wound. Brinkley eventually got into the 1976 or 1977 blue Chevrolet Impala with the three men. Barbee was left at the market.

This same evening, Clara Coleman was helping in some remodeling work on a business located in the same building as G-Man's Market. She heard gunshots and looked out in time to see a light blue older model car speed away from the market. She testified that she saw three or four black men in the car. Ms. Coleman did not know Brinkley.

As the car drove off, Defendant told the shooter to put duct tape over Brinkley's face and to bind his hands together with the tape also. Defendant held the shooter's gun while he taped up Brinkley. According to Brinkley, the car ride lasted about 15 to 25 minutes. Defendant kept saying to Brinkley, "you think I'm playing with you?" The car eventually came to a stop and the men pulled Brinkley out and took him into a garage or shed. They bound his feet with duct tape. There the three men proceeded to beat Brinkley. Defendant pistol-whipped him. Brinkley testified that he believes he passed out two or three times during the beatings which he estimated lasted "for hours." Defendant then forced Brinkley to make several cellular phone calls in an effort to have Brinkley's wife bring the deed to their house. Calls

were made to Brinkley's mother, aunt, brother-in-law, and a cousin, but they could not locate Brinkley's wife.

Brinkley said that three or four more black men later joined the group and participated in the beatings. Brinkley still had tape over his eyes, but he said he could tell the men were black by their voices. The men took his wallet which had about $300 cash in it. They cut his pants and inflicted a four to five inch laceration on his left thigh. According to Brinkley, his attackers poured some liquid on his wound and attempted several times to light it with a match, although doctors were unable to find any evidence of burns. However, a trauma surgeon who treated Brinkley at Vanderbilt testified that lacerations often produce a burning sensation, particularly if liquid is poured on them.

The beatings continued until someone said "kill him." At this point, most of the men stepped outside to confer, but when they returned Brinkley was told that he was "lucky." They then cut the tape from his ankles, threw him back in the car, and drove to Whites Creek Pike. The car slowed down near the United Parcel Service location and Brinkley was thrown out. He testified that as he rolled down an embankment, he heard two or three shots fired. The car then took off.

Brinkley was able to pull the tape from his eyes enough to see, and he then walked to the UPS security guard station. One guard called 911 while the other cut the tape from Brinkley's face and wrists. An ambulance took Brinkley to Vanderbilt Hospital where he was treated for a fracture to his upper jaw, a large cut on the back of his scalp, a cut on his left thigh, injuries to his mouth, and rib pain suggesting a fractured rib. Brinkley was discharged from Vanderbilt on December 31, 1993.

Investigators found six nine millimeter shell casings, two outside the market and four inside. Brinkley acknowledged that the fully-loaded .357 revolver found on the floor of the market belonged to Barbee, who usually carried it in his coat pocket. Also, a fully-loaded nine millimeter semiautomatic pistol was found under the cash register. Brinkley identified that gun as belonging to him. Officer Brad Corcoran testified that neither of these weapons appeared to have been fired. The only fingerprints identified at the scene were those of Brinkley and Barbee.

On January 12, 1994, the day Corey Barbee died, homicide detectives Johnny Lawrence and Mike Roland interviewed Brinkley. They showed Brinkley a photographic array from which Brinkley identified Defendant as the leader of the group that kidnapped him and killed Barbee.

The day after Brinkley was released from the hospital, Defendant called him and reiterated that he wanted the deed to Brinkley's house. When Brinkley asked why Defendant allowed Barbee to be killed, Defendant replied, "I don't give a f--- about him." Defendant continued to call Brinkley every day and sometimes several times a day. Brinkley finally called the police because of the harassing calls from Defendant. Detectives went to Brinkley's house and recorded two incoming calls from Defendant. In those calls, Brinkley and Defendant argued about the shooting of Barbee. However, Detective Clifford Douglas admitted that police made no attempt to trace the telephone calls, nor was any voice analysis done in an attempt to determine whether the calls were actually made by Defendant. Defendant continued to call Brinkley until Brinkley was incarcerated for food stamp fraud.

Brinkley acknowledged that after the incident, he was admitted to Tennessee Christian Medical Center where he claimed he remained for about a month for psychological problems. However, Brinkley admitted on cross-examination that he was only at the mental health facility for twelve days. Brinkley told a doctor at the center that he had been assaulted and kidnapped for no reason by six men. Although documented by the doctor, Brinkely denied at trial telling the doctor that he heard voices in his head or that he had fears that his friends would turn on him.

There were many inconsistencies in Brinkley's testimony. For instance, Brinkley told detectives and he testified at the preliminary hearing that he was shot, not grazed in the leg as he later claimed. He initially told police that his ankles were taped while he was in the car and that a hood was placed over his head. However, at trial he testified that only his hands were bound and that tape, not a hood, was placed over his eyes. He acknowledged falsely testifying at the preliminary hearing that his nose was broken, and that both his upper and lower jaws were broken. He testified that during the beatings that he called his cousin, Becky Bonds, and told her to go to the G-Man's Market and try and find his wife. However, Ms. Bonds testified that Brinkley called her and told her to go to the market in order to put the telephone back on the hook. Brinkley originally told police that he was assaulted due to a dispute about "running numbers," not drugs, at his market. He testified at the preliminary hearing that he was hospitalized for four or five days. He said that if hospital records indicated that he spent only one night in the hospital, "I know that would be a lie." Brinkley testified at trial that he first met Defendant when both attended Maplewood High School in 1984 or 1985. However, he admitted testifying at the preliminary hearing that he met Defendant two years before the shooting at his auto detail shop. There were also numerous inconsistencies and discrepancies

in his testimony pertaining to the drug transactions, such as when exactly the transactions occurred and the amount of drugs and money actually involved.

## I. Sufficiency of the Evidence

Defendant raises two arguments that the evidence was insufficient to convict him of second degree murder and aggravated kidnapping. First, he contends that the State failed to prove his identity as perpetrator of the crimes. Second, he argues that the evidence was insufficient to prove that he was criminally responsible under Tenn. Code Ann. § 39-11-402 for the conduct of another person in murdering Corey Barbee.

When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosection, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). This standard is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App.), perm. to appeal denied, id. (Tenn. 1987). Nor may this court reweigh or reevaluate the evidence. Cabbage, 571 S.W.2d at 835. A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. Grace, 493 S.W.2d at 476.

Moreover, a criminal offense may be established exclusively by circumstantial evidence. Duchac v. State, 505 S.W.2d 237 (Tenn. 1973); State v. Jones, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995); State v. Lequire, 634 S.W.2d 608 (Tenn. Crim. App. 1981). However, before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude beyond a reasonable doubt every other reasonable hypothesis save guilt of the defendant." State v. Crawford, 225 Tenn. 478, 470 S.W.2d 610 (1971); Jones, 901 S.W.2d at 396. In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Crawford, 470 S.W.2d at 613; State v. McAfee, 737 S.W.2d 304, 306 (Tenn. Crim. App. 1987).

A. Identity

Garland Brinkley identified Defendant as one of three men who entered his store on the night of December 29, 1993, and kidnapped him after one of the men shot Corey Barbee. Two weeks after the shooting, homicide detectives interviewed Brinkley. The detectives showed him a photographic array from which Brinkley

identified Defendant as the leader of that group. Police subsequently tape-recorded two phone calls from Defendant to Brinkley, in which the two angrily discussed the events of December 29, 1993, and the shooting of Barbee. Brinkley identified the voice at the other end of those calls as that of Defendant. At trial, Brinkley identified Defendant in the courtroom as the person who was present when Barbee was shot and when he was kidnapped.

Defendant asserts that Brinkley's identification testimony was suspect because of inconsistencies in other areas of his testimony. However, Brinkley's identification of Defendant as the perpetrator was never contradicted by any other evidence or by any inconsistent identifications. Again, he identified Defendant in the photo lineup as the perpetrator as well as the in-court identification at trial. He also identified Defendant's voice on the taped telephone calls. Despite defense counsel's attempt to impeach Brinkley, the jury weighed his testimony and found Brinkley's identification of Defendant sufficient to convict.

It is well-established that the identification of a defendant as the perpetrator of the offense for which he is on trial is a question of fact for determination by the jury. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993), perm to appeal denied (Tenn. 1994). Further, the identification testimony of a victim is, by itself, sufficient to support a conviction. Id. Garland Brinkley's identification of Defendant as the perpetrator is thus sufficient to support the convictions in this case. This issue is without merit.

B. Criminal Responsibility

Defendant argues that he was improperly found criminally responsible for the conduct of his masked accomplice who shot and killed Corey Barbee. He argues that there was no proof that he shared any common intent with that assailant or that he acted with intent to promote or assist in the shooting.

In order to convict Defendant under the theory of criminal responsibility, the State was required to prove beyond a reasonable doubt that Defendant solicited, directed, aided or attempted to aid another person to commit the offenses while "acting with the intent to promote or assist the commission of the offense[s], or to benefit in the proceeds or results of the offense[s]. See Tenn. Code Ann. § 39-11-402(2). This code provision is the codification of the "natural and probable consequences" rule from the common law pertaining to aiders and abettors. See Tenn. Code Ann. § 39-11-402 Sentencing Commission Comments; State v. Carson, 950 S.W.2d 951, 953 (Tenn. 1997). Thus, under Tenn. Code Ann. §§ 39-11-401 and 402, an individual in a multiple offender felony is responsible for the criminal acts of any of the other participants if the individual shares in the intent to commit the primary felony and the criminal acts committed by the other participants are the natural and probable consequence of the commission of the primary felony. Id. at 953-54.

The evidence in this case shows that Defendant and the unknown shooter were united in the common purpose of committing the kidnapping of Garland Brinkley. Defendant had been involved in drug deals with Brinkley. On the morning of the shooting, Defendant telephoned Brinkley to demand payment of a drug debt and later went down to G-Man's Market for the same purpose. Later that same day, Defendant and two unidentified masked men together burst into the market at

closing time. Defendant and at least one of the other men were armed. After the first masked man shot Barbee, the three perpetrators abducted Brinkley, with Defendant giving the orders the entire time. As the car drove off, Defendant told the shooter to put duct tape over Brinkely's eyes and to bind his hands. Defendant held the shooter's gun while the tape was being put on Brinkley. All three men were clearly united in the common purpose of kidnapping Brinkley.

The murder of Corey Barbee occurred as a natural and probable consequence of the kidnapping. As the men entered the market that evening, the shooting started almost immediately. The police found Barbee's own firearm fully loaded and apparently unfired near his body. The shooting was a natural and probable consequence of the action by the kidnappers.

The evidence, together with the reasonable inferences from that evidence, clearly demonstrate the Defendant "knowingly, voluntarily, and with common intent unite[d] with the principal offenders in the commission of the crime" and is, therefore liable for their actions. Carson, 950 S.W.2d at 954 (quoting State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)). Viewing the evidence in the light most favorable to the State, as we are required to do upon appeal, a reasonable jury could have determined that Defendant played an active role in the crime by acting as the leader of his co-perpetrators, thereby aiding the commission of the offenses and acting with the intent to assist in the crimes. Clearly, it was reasonable for the jury to conclude that Defendant's role exceeded mere presence and that he associated himself with the venture and shared in the criminal intent of the perpetrators. See Carson, 950 S.W.2d at 954 (citation omitted). This issue is without merit.

## II. Victim's Compensation

The trial court refused to allow defense counsel to cross-examine Brinkley regarding a claim he had filed with the State Division of Claims Administration for criminal victim's injury compensation under Tenn. Code Ann. § 29-13-101 et seq.

During an offer of proof by the defense, Brinkley acknowledged that his claim had been dismissed. Defendant argues that cross-examination regarding the victim's compensation claim should have been allowed as impeachment evidence of bias or prejudice under Tenn. R. Evid. 616. Defendant contends that the excluded evidence was relevant to Brinkley's credibility by its suggestion that the witness exaggerated his injuries "in a failed attempt to benefit financially from the crimes allegedly committed by the defendant." In other words, Defendant argues that Brinkley was a biased witness because he allegedly had a financial stake in the criminal prosecution. He also argues that the excluded evidence showed that Brinkley had made false statements of his injuries in the application for victim's compensation.

In the claim filed, Brinkley alleged that he was shot, beaten and kidnapped, and that he suffered serious injuries to his leg, neck, head, back and ribs. The claim also alleged that Brinkley knew Defendant "from their neighborhood." The claim requested $5,000 for mental health counseling, $3,000 for loss of income, and $50,000 for "permanent disability." Brinkley testified at trial that even though he signed the claim for victim's compensation that his attorney actually prepared it and that he did not read it before signing.

After a careful review of the evidence, we find that it was error to exclude the aforementioned evidence because it is admissible to impeach Brinkley's credibility. This Court has held that "for the purpose of showing interest, or bias, a witness for the prosecution in a criminal case may be questioned as to whether he has brought an action against the accused, based on the acts involved in the criminal case." State v. Horne, 652 S.W.2d 916, 919 (Tenn. Crim. App. 1983). In the instant case, the excluded evidence showed that Brinkley, the key witness in this case, sought monetary compensation in the total amount of $73,000 due to Defendant's actions. In seeking such compensation, Brinkley signed a notarized statement averring that he was permanently disabled. His claim was later dismissed because he was unable to offer proof of his losses and expenses. At trial, Brinkley's testimony made no reference to him being permanently disabled. The excluded evidence could have suggested to the jury that Brinkley exaggerated the nature of his injuries in an attempt to benefit financially from the crimes allegedly committed by Defendant. This is precisely the type of evidence rendered admissible to show bias or prejudice under Tenn. R. Evid. 616.

However, as mentioned before, Brinkley's claim had been dismissed before he testified at the trial in this case. Therefore, at the time of his trial testimony, Brinkley had no real pecuniary interest in the case. Furthermore, even though the claim for compensation was erroneously excluded, we find that ample evidence had already been admitted regarding Brinkley's prior inconsistent statements. For instance, defense counsel vigorously cross-examined Brinkley regarding his prior statement about the nature and extent of his injuries and the length of his hospitalization. A Vanderbilt University trauma surgeon who treated Brinkley also revealed further inconsistencies in Brinkely's descriptions of his injuries, as did the

admission notes and discharge summaries recounting his complaints when he was treated.

Although we believe that the trial judge should have admitted the evidence, we do not believe his failure to do so resulted in reversible error. Tenn. R. App. P. 36(b). We find that the trial court's ruling in not allowing cross-examination regarding Brinkely's victim's compensation claim did not affect the outcome of the trial in this case, and that any error in not allowing it was harmless. Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

### III. Prior Incarceration Statement

In this issue, Defendant argues that the trial court erred in overruling his objection to Brinkley's references to Defendant's prior incarceration. Brinkley testified on direct examination that he was involved in two cocaine transactions with Defendant prior to the shooing at G-Man's Market. During cross-examination of Brinkley, defense counsel was exploring the timing and circumstances of Brinkley's prior drug transactions with Defendant. Defense counsel was also trying to establish that Brinkley had no personal dealings with Defendant, but only with a man named "Eric," described by Brinkley as Defendant's "go-between." The following exchange occurred in the presence of the jury:

> Q (By Ms. Tucker): Okay. And I want to look at, if we can, these deals that you're talking about. Okay? You said there were two separate incidents, right?
>
> A: Yeah.
>
> Q: Two separate transactions?

A: Yes.

Q: That you got through Eric, right?

A: Yes.

Q: And I believe you said it was how long before this incident happened?

A: Maybe about three weeks. I think about three weeks. I'm not sure.

Q: Do you remember telling Detective Johnny Lawrence it was about six and a half months before this incident happened?

A: What, from the prior time he got out?

Q: I'm talking about the first deal. Was it six and a half months or three weeks before this incident?

A: Well, when it happened? When the incident happened?

Q: The first--right.

A: No. When--

Q: The first drug transaction.

A: It was like three weeks in that period of time.

Q: Okay.

A: But after--after he got out of jail--

Ms. Tucker: Okay. Your Honor, I'm going to object to that as completely irrelevant.

Brinkley's first reference to Defendant's incarceration, "the prior time he [Defendant] got out," drew no objection from defense counsel. However, counsel did object to the reference "after he got out of jail," as irrelevant and nonresponsive. The trial court overruled the objection, noting that Brinkley's comment was in fact

-17-

responsive to defense counsel's question. A few minutes later, the following exchange occurred, also in the presence of the jury:

> Q: (By Ms. Tucker): Those are the only deliveries that you say were between you and Harold Shaw?
>
> A: Yeah.
>
> Q: The only ones?
>
> A: Yeah.
>
> Q: And they were both delivered by Eric?
>
> A: Right.
>
> Q: Okay. The first transaction, how long before the shooting of Bruno was it?
>
> A: Like I said at first, he wasn't even out of jail yet.

Defense counsel made no objection at all to this third reference to Defendant's prior incarceration. All three comments regarding Defendant's previous incarceration came during defense counsel's aggressive cross-examination. Brinkley never mentioned the offense(s) for which Defendant had been incarcerated. By exploring the timing of Brinkley's drug deals with Defendant, the defense opened the door to the relevant fact that their course of drug dealing began while Defendant was still in jail. As the trial court found, the references made by Brinkley were responsive to defense counsel's questions, and we therefore find this issue to be without merit.

## IV. Mistrial

-18-

During cross-examination of a police detective called as a witness by Defendant, the State asked if Defendant was on the TBI's "Most Wanted List" at the time of his taped telephone calls to Brinkley. Defense counsel moved for a mistrial and the trial court conducted a bench conference out of the hearing of the jury. The court found that an earlier witness, Homicide Detective Johnny Lawrence, had already testified, without objection, that Defendant was placed on the TBI's "Most Wanted List." Although the trial court denied the mistrial motion, it did instruct the prosecutor to not "go any further on it, General." Defense counsel did not request a curative instruction.

Whether an occurrence during the course of a trial warrants a mistrial is a matter which addresses itself to the sound discretion of the trial court, and this Court will not interfere with the exercise of that discretion absent clear abuse. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994), perm. to appeal denied (Tenn. 1994). The burden of establishing the necessity for mistrial lies with the party seeking it. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). In making this determination, no abstract formula should be mechanically applied, and all circumstances should be taken into account. State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993).

When the trial court denied Defendant's motion for a mistrial, Defendant should have requested a curative instruction. See McPherson, 882 S.W.2d at 371. "[A]n accused is not entitled to relief when he fails 'to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.'" Id. (citing Tenn. R. App. P. 36(a)). As the McPherson court points out, counsel may have wanted to avoid calling further attention to the matter by asking for an instruction.

Such a decision would have been a legitimate trial tactic.  882 S.W.2d at 371.
Nonetheless, failure to request a curative instruction technically waives this issue.

However, even after having reviewed the record, we are unable to conclude that the second question regarding Defendant being on TBI's "Most Wanted List" created a manifest necessity for a mistrial.  We cannot say that the question "more probably than not affected the judgment" in this case.  Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).  The question had previously been asked without objection and the Defendant's objection and the trial court's action prevented the witness from even answering.  Thus, we cannot say that the trial court abused its discretion in denying Defendant's motion for a mistrial.  Any error was harmless.  Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

### V.  Failure to Charge Lesser Included Offense

Defendant argues in this issue that the trial court erred by not charging the jury with the lesser included offense of facilitation of second degree murder.  The jury was charged on the offenses of premeditated first degree murder, criminal responsibility for facilitation of first degree murder, and second degree murder.  As to all of these charges, the court instructed the jury regarding the concept of criminal responsibility for the conduct of another.  Defendant contends that facilitation of second degree murder should have also been charged. However, Defendant failed to raise this issue in his motion for new trial.  In Harrison v. State, 532 S.W.2d 566 (Tenn. Crim. App. 1975), and again later in State v. Spadafina, 952 S.W.2d 444 (Tenn. Crim. App. 1996), this Court held that the failure to raise this very issue in a

motion for new trial waived the issue on appeal. This Court also stated that unless the trial court were given an opportunity to address the issue through a motion for new trial, then the issue will not be considered on appeal. Spadafina, 952 S.W.2d at 451 (citation omitted); see also Tenn. R. App. P. 3(e).

However, Defendant contends that this Court should recognize plain error in this instance. This Court may, in an exercise of its discretion, consider an issue which has been waived. In order for this Court to find plain error, the error must affect a substantial right of the accused. Tenn. R. Crim. P. 52(b). After a careful review of the record, we find that the evidence in this case did not fairly raise the issue of facilitation of second degree murder as a lesser offense, and the trial court therefore properly omitted it from the jury instructions. This Court has held that a jury should be instructed on facilitation only when the evidence raises an issue that the defendant "lacked the intent to promote or assist in, or benefit from, the [underlying] felony's commission." State v. Utley, 928 S.W.2d 448, 452 (Tenn. Crim. App. 1995). The general rule is that a trial court need only instruct on a lesser offense when the evidence would support a conviction for that offense. State v. Trusty, 919 S.W.2d 305, 311 n.5 (Tenn. 1996).

The record in the case sub judice, as fully explained in Issue I, clearly supports Defendant's conviction for criminal responsibility for the shooting of Corey Barbee, and is devoid of any evidence upon which a rational jury could have found him guilty of mere facilitation. A defendant is responsible for facilitation of a felony if "knowing that another intends to commit a specific felony, *but without the intent required for criminal responsibility under § 39-11-402(2),* the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann.

-21-

§ 39-11-403 (emphasis added). There is no evidence in the record that Defendant knew of his accomplice's intent to shoot Barbee but lacked the intent to benefit from the felonious conduct. On the contrary, the evidence shows that Defendant knew of the armed kidnapping and the natural and probable consequence that a shooting would occur, and he intended to benefit from it all. The evidence showed that the armed kidnapping was part of an effort by Defendant to collect drug debts from Brinkley. Thus, the evidence showed an intent by Defendant "to benefit in the proceeds or results of the offense," a key element of the intent required for criminal responsibility. See Tenn. Code Ann. § 39-11-402(2). Therefore, Defendant lacked the mental state for facilitation. In the context of plain error, we see nothing that affects the substantial rights of Defendant. See Tenn. R. Crim. P. 52(b). This issue is without merit.

## VI. Sentencing

When an accused challenges the length, range, or the manner of service of a sentence, this court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In conducting a de novo review of a sentence, this Court must consider the evidence adduced at trial and the sentencing hearing, the presentence report, the principles of sentencing, the arguments of counsel relative to sentencing

alternatives, the nature of the offense, and the defendant's potential for rehabilitation. Tenn. Code Ann. § 40-35-210; State v. Parker, 932 S.W.2d 945, 955-56 (Tenn. Crim App. 1996).

If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after having given due consideration and proper weight to the factors and principals set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). After a careful review of the record, we conclude that the trial court failed to follow proper statutory sentencing guidelines, and therefore, review by this Court will be de novo without the presumption of correctness.

A. Range

Defendant was sentenced by the trial court as a Range II Multiple Offender. However, the State concedes, and we agree, that Defendant should be sentenced as a Range I Standard Offender. See Tenn. Code Ann. § 40-35-202(a).

B. Enhancement Factors

The trial court found the five following enhancement factors to be applicable to Defendant's convictions of second degree murder and aggravated kidnapping:

> 1. Defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
>
> 2. Defendant was a leader in the commission of an offense involving two (2) or more criminal actors;

3. The offense involved more than one victim;

4. Defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense; and

5. Defendant had no hesitation about committing a crime when the risk to human life was high.

See Tenn. Code Ann. § 40-35-114(1), (2), (3), (5) and (10). The trial court found no applicable statutory mitigating factors. Defendant does not contest the applicability of the enhancement factor pertaining to his previous history of criminal behavior or the factor pertaining to him being a leader where there are two or more criminal actors. See Tenn. Code Ann. § 40-35-114(1) and (2). Defendant also does not challenge the applicability of the exceptional cruelty factor to the aggravated kidnapping conviction. See Tenn. Code Ann. § 40-35-114(5). However, Defendant does challenge three other factors to the second degree murder conviction, and two factors to the aggravated kidnapping conviction.

First, the State concedes, and we agree, that enhancement factor (3), that the offense involves multiple victims, does not apply in this case. See Tenn. Code Ann. § 40-35-114(3). Defendant was convicted of the second degree murder of the victim Barbee, and was convicted of the aggravated kidnapping of the victim Brinkley. This Court has held that where a defendant is convicted of a separate offense against each of the two victims, this enhancement factor does not apply. See State v. Williamson, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995); Tenn. Code Ann. § 40-35-114(3). Therefore, enhancement factor (3) should not be applied to either conviction.

Next, Defendant contends that the enhancement factor involving exceptional cruelty to the victim does not apply to the second degree murder conviction. See

Tenn. Code Ann. § 40-35-114(5). However, he does concede that it applies to the aggravated kidnapping conviction. The evidence shows that victim Corey Barbee was shot five or six times by his assailant and died approximately two weeks later in the hospital. This Court has held that the application of Tenn. Code Ann. § 40-35-114(5) requires a finding of cruelty over and above that inherently attendant to the crime for which the defendant is convicted. State v. Embry, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995). This factor has typically been applied in situations where the victim(s) were tortured or abused. See State v. Davis, 825 S.W.2d 109, 113 (Tenn. Crim. App. 1991), perm. to appeal denied (Tenn. 1992). Although it was undoubtedly cruel to shoot the victim multiple times at close range, this case involved no extended length of torture, nor any unusual type of abuse that would uphold this factor. We find no evidence in the record to support a finding of exceptional cruelty. See State v. John Dennis Rushing, C.C.A. No. 01C01-9501-CR-00020, Davidson County (Tenn. Crim. App., Nashville, Feb. 13, 1996). In State v. Thomas Edward Murphy, Jr., C.C.A. No. 02C01-9502-CC-00032, Fayette County (Tenn. Crim. App., Jackson, June 28, 1996), this Court held that Tenn. Code Ann. § 40-35-114(5) did not apply to a second degree murder conviction where the victim was shot twice in the chest and once in the head.

Furthermore, the victim's medical complications which may have caused him to suffer before his ultimate death do not affect the applicability of this particular enhancement factor. This Court has specifically limited the application of Tenn. Code Ann. § 40-35-114(5) to the treatment of the victim during the commission of the offense. See State v. Robert William Holmes, C.C.A. No. 01C01-9303-CC-00090, Montgomery County (Tenn. Crim. App., Nashville, Aug. 11, 1994), perm. to appeal denied (Tenn. 1995). Based on the foregoing, we find that the trial court

erred in applying enhancement factor (5) to the second degree murder conviction, but as Defendant concedes, it is applicable to the aggravated kidnapping conviction.

Defendant also challenges the applicability to both convictions of enhancement factor (10), "no hesitation to commit the crime when the risk to human life was high." Tenn. Code Ann. § 40-35-114(10). The courts of this State have consistently held that this factor does apply, however, when persons other than the intended victim are present and placed at risk of harm. See, e.g., State v. Ruane, 912 S.W.2d 766, 784 (Tenn. Crim. App. 1995); State v. Makoka, 885 S.W.2d 366, 373 (Tenn. Crim. App. 1994). In this case, Brinkley was present and in close proximity when the intruders entered the market and fired five or six shots at Corey Barbee. Also, the intrusion by the three men, at least two of whom carried firearms with the intent to kidnap Brinkley, placed Barbee at risk of his life and in fact resulted in his death. Therefore, each of Defendant's offenses was committed under circumstances which created a high risk to the life of a person other than the intended victim. The trial court properly applied enhancement factor (10) to both the second degree murder conviction and the aggravated kidnapping conviction.

In summary, upon remand for resentencing within Range I, the trial court should apply enhancement factors (1), (2) and (10) to the second degree murder conviction and enhancement factors (1), (2), (5) and (10) to the aggravated kidnapping conviction.

C. Consecutive Sentencing

In ordering that Defendant's sentences for aggravated kidnapping and second degree murder be served consecutively, the trial court stated:

> [T]he Court recalls that this was a case where an innocent bystander, in all effect, was just shot down because, it's apparent from the proof in this case, the Defendant did not receive his money from drug transactions.
>
> The scourge of this community is based on drug transactions. Most of the difficulty we have in this court is the result of drug transactions. This [c]ourt has no sympathy, whatsoever, for an individual that participates, or commits, murder to enforce drug transactions.

The trial court failed to follow proper statutory sentencing procedure, in that it did not set forth the required statutory reasoning in imposing consecutive sentences. Therefore, on remand of this case to the trial court, it must state specific findings of fact and conclusions of law on the record if consecutive sentencing is imposed.

Defendant also contends that even if consecutive sentencing was proper in the case sub judice, the trial court nevertheless erred in ordering his sentences in this case to be served consecutively to his sentence in another case, Davidson County Criminal Court docket no. 92-A-104. Defendant argues that the conviction in that case has not been reduced to judgment and the sentence has not yet been imposed, thereby not making it a previously imposed sentence to which the present sentences may be run consecutively.

The detailed facts surrounding this issue reveal that in May of 1993, Defendant went to trial and was convicted by a jury on the charge of possession of cocaine with intent to deliver, a Class B felony. The trial court sentenced Defendant to eight (8) years as a Range I Offender. However, subsequently on a post-verdict motion for judgment of acquittal, the trial court concluded that the evidence of Defendant's intent to deliver was insufficient. The court therefore set aside the verdict, acquitted Defendant of felony possession, and sentenced him to eleven (11)

months and twenty-nine (29) days for misdemeanor cocaine possession. The State appealed. <u>See</u> <u>State v. Harold Wayne Shaw</u>, C.C.A. No. 01C01-9312-CR-00439, slip op. at 1, Davidson County (Tenn. Crim. App., Nashville, Oct. 24, 1996).

The State's appeal was pending at the time Defendant committed the offenses in this case. On October 24, 1996, this Court issued its decision reversing the trial court's action. This Court expressly ordered the following in regard to sentencing:

> The case is remanded to the trial court for it to reinstate the eight-year sentence and five thousand dollar fine and to enter a judgment of conviction for possession of cocaine with the intent to deliver, a Class B felony.

<u>Id.</u>, slip op. at 4. Defendant did not apply to the supreme court for permission to appeal, and the mandate issued January 2, 1997.

The effect of this Court's reversal of the trial court's action was to restore the original felony conviction as if the trial court had never set it aside. A decision of an appellate court reversing or modifying a trial court decision is effective retroactively to the date of the original judgment, unless the appellate court judgment specifies otherwise. <u>Gotten v. Gotten</u>, 748 S.W.2d 430, 431 (Tenn. App. 1987).

In defendant's case, this Court explicitly directed the trial court on remand to reinstate the Class B felony conviction and the eight (8) year sentence as well as the original fine imposed. <u>Shaw</u>, C.C.A. No. 01C01-9312-CR-00439, slip op. at 4. Defendant's 1993 felony conviction for possession of cocaine with intent to deliver was therefore reinstated retroactively to the date it was originally entered. That makes the eight (8) year sentence on that conviction a previously imposed sentence. The trial court was therefore authorized by Tenn. R. Crim. P. 32(c)(2) to run the

sentences in this case consecutively to the sentence in the earlier case. This issue is without merit.

## Conclusion

Based on all the foregoing, Defendant's convictions for second degree murder and aggravated kidnapping are affirmed. The case is remanded to the trial court for resentencing in accordance with this opinion.

_____
THOMAS T. WOODALL, Judge

CONCUR:


_____
JOHN H. PEAY, Judge


_____
L.T. LAFFERTY, Special Judge