# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### JANUARY SESSION, 1998

**FILED**

November 10, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 01C01-9701-CR-00024** |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | **DAVIDSON COUNTY** |
| **VS.** | ) | |
| | ) | **HON. THOMAS H. SHRIVER** |
| **PASCHAL HYDE, JR.,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | (Attempted 1st Degree Murder, |
| | ) | Aggravated Rape, Assault) |

## ON APPEAL FROM THE JUDGMENT OF THE
## CRIMINAL COURT OF DAVIDSON COUNTY

FOR THE APPELLANT:

TERRY J. CANADY
211 Printer's Alley Building
Suite 400
Nashville, TN 37201

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

DARYL J. BRAND
Assistant Attorney General
425 5th Avenue North
Nashville, TN 37243-0493

VICTOR S. JOHNSON
District Attorney General

MARY HAUSMAN
Assistant District Attorney General
Washington Square, Suite 500
222 2nd Avenue, North
Nashville, TN 37201-1649

OPINION FILED _____

AFFIRMED IN PART; REVERSED IN PART; REMANDED

DAVID H. WELLES, JUDGE

# OPINION

The Defendant, Paschal Hyde, Jr., appeals as of right pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure. He was convicted by a Davidson County jury of three counts of aggravated rape, three counts of assault, and two counts of attempted first-degree murder. He was sentenced to concurrent terms of life for each conviction for aggravated rape. He was sentenced to eleven months and twenty-nine days for each count of assault, to be served concurrently with each other and with his convictions for aggravated rape. For the two attempted first-degree murder convictions, the Defendant was sentenced to twenty-five years on each count to be served consecutively to each other and to the other convictions. Thus, his effective sentence is life plus fifty years. The Defendant appeals both his convictions and sentences, raising the following issues: (1) That the evidence was insufficient to convict him of aggravated rape; (2) that the trial court erred by denying the Defendant's motion to sever the offenses; (3) that counts one, two and three in the indictment are invalid because they failed to specify the requisite mens rea for aggravated rape; and (4) that the trial court erred by misapplying sentence enhancement factors and ordering consecutive sentences. After a careful review of the record in this case, we affirm in part and reverse and remand in part the judgment of the trial court.

The Defendant and the primary victim in this case, Nicole Bowman, had a lengthy and disturbing history together prior to the prosecution of the Defendant

on these numerous charges. The Defendant was her stepfather. Teresa Bowman, the victim's mother, lived with the Defendant when Nicole was small. Teresa Bowman had two children fathered by the Defendant, Antonio Hyde and Felicia Bowman. Nicole recalled that the Defendant lived with them when she was very little and called her names, such as "blackie" and "ugly." The Defendant would grab Nicole by her right arm and talk "dirty" to her. At age three, four, or five the Defendant began to vaginally penetrate Nicole with his index and middle fingers. Sometimes she would not cooperate and refuse to open her legs and the Defendant would yell at her, choke her, smother her, and put his hand over her mouth. Nicole would cry and tell the Defendant that the penetration with his fingers hurt her. The Defendant penetrated her in this fashion approximately three or four times per week. After the act was completed, the Defendant would hug Nicole and would ask if she wanted anything. These acts would occur at night because her mother worked at night. The Defendant would accost the victim in her bedroom and the bathroom. The Defendant would kiss her, would try to put his penis in her mouth, and would lie on top of her. The Defendant wore underwear and would remove Nicole's underwear and rub his penis against her until he reached a climax. He would penetrate her with his fingers. Felicia Bowman would sleep in the same room with Nicole and would often wake up in the night and see the Defendant in the room. Teresa Bowman often took Felicia out with her and left Nicole with the Defendant.

The Defendant lived with Nicole until she was thirteen. After he left, he would continue to send for her or come to her house when her mother was working. Nicole recalled that this would happen particularly on special occasions like the Defendant's birthday or Father's Day because he would remind her "I know you gonna give me some." The victim never told anyone because the Defendant threatened to kill her or her mother. Nicole once attempted to tell her mother when Teresa Bowman was going to the laundromat with Nicole's sister, Felicia. Nicole cried and begged to go, but her mother left her at the house with the Defendant. The Defendant then sexually penetrated the victim and made it hurt as punishment because she had not cooperated.

When Nicole was eighteen[1], she was dating a boy and her mother had told the Defendant. The Defendant insisted that Nicole tell him what she did with her boyfriend and she admitted that she had been having sexual relations with him. The Defendant slapped her in the face and pushed her head to the window while they were traveling in his car. He said she was a slut. He stated: "You supposed to be a Christian. You ain't nothing but a whore. You just like your mama. Y'all ain't amount to nothing -- y'all not gonna amount to nothing, never will be nothing." He took her to his friend Fanny Lee's house and took her into the bathroom and pushed her in the tub. The Defendant spit in her face and called her names. The Defendant later had sexual intercourse with the victim. She

---

[1] In her trial testimony, Nicole Bowman first stated that the incident occurred when she was fifteen. In her later testimony, she stated that she was eighteen when the incident occurred.

resisted and the Defendant smothered and choked her and forced her legs apart and penetrated her with his penis. Such encounters continued with frequency until Nicole was twenty-one years old.

Nicole graduated from high school in June of 1992 and worked at Kroger, and then Lockheed Support Systems in Nashville. When Nicole received her paycheck, she would have to surrender the money to the Defendant immediately because he told her she owed it to him because he had taken care of her all her life. The Defendant would then distribute half of the money to Nicole. The Defendant had also cosigned an auto loan for Nicole. Nicole made all the payments for the car and the Defendant used the money she gave him every week to pay the note on his red pickup truck. During this time, the Defendant lived with the woman named Fanny Lee. Ms. Lee owned the home and paid the bills, so the Defendant lived there for free. The Defendant made Nicole keep her car at Ms. Lee's house and she could only use it to drive to work, to church, and occasionally to the park on Sunday afternoons. The Defendant told Nicole that her parents should know where she was at all times and she carried a pager. The Defendant knew her work schedule and the amount of time it would take to get there and back home. Nicole had no social life and did not have close friends.

Nicole started dating Claude Rucker shortly before the acts which resulted in the attempted murder convictions. She would sneak to see him between 9:30 when she got off work and 10:30 when her sister got off work at Lockheed

because she drove her sister to work and had to wait until her shift ended. The Defendant was unaware of her relationship with Mr. Rucker. On November 6, 1994, Nicole attended church with her family, including the Defendant who at that time was an assistant minister. She noticed that he was acting strange and was not reading the Bible, but sitting there like he had something on his mind. As Nicole and her family were leaving the church, a man named Lawon had his arm around her shoulder and they were discussing his getting a job at Lockheed. The Defendant essentially broke the conversation up and told Nicole and her sister Felicia to go home. At home, the Defendant confronted Nicole, claiming that she had an "attitude problem." She told the Defendant that he had the problem, not her, and she walked off. She stated that she just could not take it anymore.

Later that evening, in the Defendant's presence, Nicole and Felicia were arguing about late fees for a rented video tape. He started criticizing Felicia, stating that she was selfish and would not amount to anything. Felicia blurted out something about Nicole using up gas in the car. The Defendant jerked Nicole up by the collar and threw her on a chair. Felicia ran out and the Defendant told their brother Tony to unplug the telephone. He told Nicole to park her car in his yard and complained again of her attitude problem. He threatened to tear up the car. Meanwhile, Felicia had called the police. Nicole initially sought a warrant, but did not get one at that time. She then decided to stay at Claude Rucker's house. The next day, the Defendant drove her to work because he would not let her use her car. Nicole told Erica Frierson, her friend at Lockheed, that she was going to ride home with her an hour early and get her clothes. Her mother saw

that she was home early and asked whether the Defendant knew this. Nicole told her mother she was staying the night with Ms. Frierson, but she went to Claude Rucker's house. Ms. Frierson drove Nicole to work on Tuesday, November 8, 1994.

That morning, Mr. Rucker went over to his mother's house to check on her and the Defendant was there. Mr. Rucker had noticed the Defendant hanging around at his mother's house a lot during the prior week and felt that he was looking for some information. Mr. Rucker volunteered to talk with the Defendant and told him that he was dating Nicole. The Defendant initially indicated that he had no problem with them dating, but then launched into concerns about Nicole's lying to him and his attitude reflected rage. The Defendant refused to shake hands with Mr. Rucker when he left.

Rucker thought that the Defendant went to Lockheed when he started receiving pages with the number 911. Meanwhile, Nicole's manager at Lockheed, William Brady, informed her that the Defendant was there and wanted to speak with her. Although she was reluctant, she clocked out and went outside. Erica Frierson told Brady that it was not a good situation. Brady went outside and observed the Defendant telling Nicole that she needed to apologize to her mother. The conversation escalated and the Defendant tried to force Nicole into a blue Blazer. As Brady turned to go inside and tell his employees to call the police, Erica Frierson came out and walked up behind the Defendant. She told Nicole that she did not have to go with the Defendant. He turned around and

threw her to the pavement. Nicole scrambled across the car seat and got out through the driver's side door. Both Nicole and Frierson headed toward the Lockheed building. Brady told them to get inside and told the Defendant that he was on private property and that he had to leave. The Defendant sat there for awhile and then left.

Claude Rucker and his sister went to Lockheed and met the Defendant's vehicle on the road. The Defendant turned around and came back, but when he saw that the police were there, he did not stop. Rucker's sister got nervous and told him she wanted to leave and he agreed to take her home. As they were traveling on Polk Avenue to Fesslers Lane, the Defendant followed them and drove beside Rucker's car. He said: "You need to go get Nicole and bring her to me where I can talk to her and you need to get her now. It's done got serious and it's going to get seriouser (sic) than that." Rucker told the Defendant that he had earlier offered to come with Nicole to talk to her mother and that he would see what he could do. They proceeded in traffic to a traffic light at Murfreesboro Road and the Defendant was approximately three cars in front. The Defendant got out of his car and told Rucker that he had to bring Nicole to him that day. The Defendant left and Rucker returned to Lockheed. Rucker went with Nicole and Erica Frierson to the police department to obtain warrants for assault.

Rucker and Nicole stayed out that evening until approximately 11:00 or 11:15. When they returned to Rucker's house, they noticed Nicole's car, a Buick LeSabre, parked on the street with the Defendant ducked down in the seat. They

kept driving and called the police from a gas station for an escort home. The Defendant was gone when they returned.

The next day, November 9th, Rucker and Nicole went out in the morning to take Rucker's sister to work. When they returned, the Defendant was at the house. He asked to speak with Nicole and approached their car and said that he did not have a weapon. They all stood on the sidewalk and the Defendant asked why Nicole was lying and disrespectful of her mother. He told her to go home with him and the conversation then continued. Rucker reached in the car and got Nicole's purse, which contained cards from the police department, as well as his car keys. He told the Defendant that they would go with him, but that he needed to go into the house for a minute. Nicole and Rucker went into the house and Rucker called the police. While they were waiting, Rucker went outside and told him that he had called the police and they would all go together to straighten things out. Rucker went inside and locked the door because they did not trust the Defendant. Soon afterwards, the Defendant knocked on the door and they let him in. The Defendant grabbed Nicole by the right arm and told her to "come on" and they both went into the bedroom. He told her "Just put my package in an envelope and stick it in the mailbox at the house." Nicole asked what he meant and he pulled out a wad of cash. She told him that she did not have to give him money anymore. The Defendant whispered in her ear: "Don't worry about it. When I see you I'm gonna shoot you down like a dog." The Defendant went into the living room and said "Claude, you can bring her home when you get ready. You've got to come out. You've got to go to the store or somewhere. . . . just

remember that I'm gonna shoot you down like a dog." Claude followed the Defendant onto the porch and the Defendant said: "Claude, you get in the way, I'm going to shoot you down like a dog, too." When the Defendant reached his car, he said "Claude, don't you cross me." Rucker and Nicole obtained warrants for threatening their lives.

The next morning, November 10, 1994, Rucker and Nicole decided to go out for breakfast. Mr. Rucker had parked his car around the corner in hopes that the Defendant would not know its location. The two walked to the car and sat in it while the engine warmed up. Nicole said, "Here comes Junior, "referring to the Defendant. The Defendant pulled up quickly in his red Ford king cab pickup truck. The Defendant opened the truck door and approached wielding a shotgun. Rucker put his car in reverse, it hesitated a minute, and the Defendant started shooting. The car swerved and hit a telephone pole. Rucker could not see well because he had blood on his face. He opened his car door and saw the Defendant ejecting the spent shell casings as if he were going to reload. Rucker took off running and the Defendant said "Uh-huh, I told you I was going to kill you." Rucker ran to a woman standing in her doorway with a cellular phone and asked her to call the police.

Fanny Lee was taking a shower between 8:00 and 8:30 a.m. when she heard someone come into the house and stand by the bathroom door for a few minutes, then leave. She thought it was the Defendant. Approximately twenty minutes later, the police came to her door. She saw that the Defendant's blue

Blazer was not parked there. She stated that the Defendant owned two guns and kept them at her house. On the morning of November 10th, the shotgun was missing. She admitted that her nephew would sometimes borrow a rifle, but she was not certain as to the difference between a shotgun and rifle.

The shotgun blasts shattered the front windshield of the car. Claude Rucker suffered injuries, including shotgun pellets and glass in his head, face, left arm and shoulder. His ear was split and had to be stitched back together. Nicole Bowman received massive injuries to her face. She was hospitalized from November to January. She lost vision in her right eye, there was damage to the roof of her mouth and her teeth, and she had to be fed through a tube. She must undergo reconstructive surgery of her nose and face. When she was released from the hospital, she was still being fed through a tube, had a suction machine and was fed oxygen through her trachea. She stayed a short while with her mother, but was rehospitalized briefly. When she was released, she went to live with Fanny Lee.

At trial, Nicole read letters that she had written to her mother in 1991 and in 1989 or 1990, alluding that her relationship with the Defendant was negative and that he had "done" things to her and that he had an "evil eye" even if he was a church deacon. The letters revealed thoughts of suicide and Nicole pleading with her mother to listen and understand her. She alluded to something "eating me up on the inside badly."

At trial, Nicole's mother, Teresa Bowman, testified on behalf of the Defendant. She admitted that when she lived with the Defendant, he made her give him the money she earned at her job. She never saw the Defendant sexually abusing her daughter. She got a letter from Nicole in 1991, but did not think she was being raped. When Nicole started staying overnight with Claude Rucker, Teresa Bowman asked the Defendant to bring her home on Tuesday, November 8th. On cross-examination, Teresa Bowman admitted that she understood that the letters written by her daughter meant that she was being sexually abused by the Defendant.

The Defendant presented a somewhat different account of the events in question. The Defendant testified that he carried a twenty-gauge shotgun for his protection. He stated that he went to Lockheed on November 8th at Teresa Bowman's behest to ask Nicole to come home. He testified that Erica Frierson grabbed him first and that he just pushed and she fell. He testified that he went to Claude Rucker's mother's house later that day to pick up a payment for hitting a "number" because Rucker's mother paid out winnings. On November 9th, the Defendant went to check on Nicole at Rucker's house. He stated that Rucker warned him not to start anything. The Defendant felt like Rucker was threatening him. He testified that Rucker sold drugs on Green Street. Rucker told the Defendant that he was dating Nicole. The Defendant stated that he kept Nicole's car at his house because it had been broken into at her house. He would clean the car and had the brakes repaired, and once found a bag of marijuana in the

car. He confronted Nicole, who denied using marijuana. He also wanted her to pay a cellular telephone bill that she had "run up."

The Defendant testified that on November 10th, he went to the cleaners, gave someone a ride, then went to Rucker's house. He saw Rucker sitting in a car, but not Nicole. He started to get out of the truck and thought Rucker was reaching under the seat for a weapon. He got his shotgun out and shot at the car. The Defendant went home, left his truck there and drove away in his Blazer. He turned himself in three days later.

On cross-examination, the Defendant denied that he exerted control over Nicole Bowman and that she had to report to him whenever she went anywhere. The Defendant testified that Nicole voluntarily had him hold her money for her because she spent a lot. He denied making Fanny Lee or any of the children give him money. He admitted that he lived without paying expenses at Fanny Lee's house and that he used the money he got to play the numbers and to buy clothes for the children. He stated that he used his own money to gamble. The Defendant denied calling Nicole "darkie." He denied that he lived with Teresa Bowman during 1979 through 1981. He denied hitting Nicole, but admitted that he may have "whooped" her once or twice. He denied any sexual contact with Nicole. He testified that Nicole made up all of the allegations, but admitted that he assaulted her. He denied that he tried to throw Nicole in his car at Lockheed and said that the witnesses were lying. The Defendant stated that he was concerned for Nicole and that shooting her was an accident. He testified that he

shot only once, even though there were two holes in the car's windshield. The Defendant stated that he left the shotgun in his truck, but the gun was never recovered.

During the January term of 1995, a Davidson County grand jury issued a five-count indictment against the Defendant for assault against Erica Frierson, two assaults against Nicole Bowman, and the attempted first degree murder of Nicole Bowman and Claude Rucker. A superseding indictment was issued from the April, 1995, term, adding counts one through eight of aggravated rape including the aforementioned offenses in counts nine through thirteen. Subsequently, the trial court dismissed counts four through eight for aggravated rape because the indictments were issued beyond the applicable statute of limitations for those offenses. Count one for aggravated rape between July through December, 1979, count two for aggravated rape between January 1 and December 31, 1980, and count three for aggravated rape between January 1 and December 31, 1981, were tried along with counts nine through thirteen regarding the events that occurred in November, 1994. The Defendant was convicted of three counts of aggravated rape, three counts of assault, and two counts of attempt to commit first-degree murder. He now appeals both his convictions and sentences.

I.

As his first issue, the Defendant argues that the evidence was insufficient to support the guilty verdicts for aggravated rape. However, during our examination of the record in this case, it appeared that plain error precluded us from such a review of the evidence.

Although the Defendant did not raise the issue on appeal, the record reflected that the State did not elect the offenses on which to rely in convicting the Defendant of the aggravated rapes which occurred in 1979, 1980, and 1981. This Court may recognize an issue for consideration when it appears as plain error. Tenn. R. Crim. P. 52(b); State v. Walton, 958 S.W.2d 724 (Tenn. 1997). An error affecting "the substantial rights of an accused may be noticed at any time . . . where necessary to do substantial justice." Id. The Defendant here requested and received a bill of particulars, but this added little specificity to the charge of multiple acts of aggravated rape.

During our initial review of the record, it became apparent that some of the proceedings in the trial court had not been transcribed and made a part of the record on appeal. We therefore gave the parties the opportunity to supplement the record if necessary and to file supplemental briefs on the issue of the failure of the State to elect the offenses upon which it relied for conviction. In its supplemental brief, the State concedes that the failure to elect constitutes error, but argues that in this case the error is harmless. We do not believe that the error is harmless beyond a reasonable doubt.

The doctrine of election applies to crimes of a sexual nature where there have been several separate incidents of sexual assault. Burlison v. State, 501 S.W.2d 801 (Tenn. 1973). Burlison holds that in these cases it is the duty of the trial judge to require the State to make an election at the close of its case-in-chief as to the specific offenses the State wishes to rely on for conviction. Id. at 804. The rule stems from an early Tennessee case, Jamison v. State, 94 S.W. 675 (1906), that required the State to elect the specific offenses involving charges of carnal knowledge of a female between the ages of twelve and eighteen years . Burlison cites three fundamental reasons for an election:

> First, to enable the defendant to prepare for and make his defense to the specific charge; second, to protect him from double jeopardy by individualization of the issue, and third, so that the jury's verdict may not be a matter of choice between offenses, some jurors convicting on one offense and others, another.

Burlison, 501 S.W.2d at 803.

The most serious concern of these three is the third requirement:

> In practice, however, election at the end of the state's proof does little to aid the defendant in preparing his defense. A defendant is obviously better served by requesting a bill of particulars before trial, pursuant to Tenn. R. Crim. P. 7(c). *See generally State v. Hicks,* 666 S.W.2d 54 (Tenn. 1984). Moreover, the second concern is largely moot, because an accused is protected from double jeopardy for the type of offense or offenses charged during the entire period of time covered in the indictment. *See State v. Hardin*, 691 S.W.2d 578, 580-81 (Tenn. Crim. App. 1985). The third *Burlison* rationale addresses the most serious concern: the well-established right under our state constitution to a unanimous jury verdict before a criminal conviction is imposed.

State v. Shelton, 851 S.W.2d 134, 137 (Tenn. 1993).

The Defendant was charged with aggravated rape; testimony concerning such behavior during the time period specified in the indictment is relevant and admissible. State v. Rickman, 876 S.W.2d 824, 828-829 (Tenn. 1994). Although this evidence was admissible, the trial court erred in allowing the state to present this evidence without requiring an election as mandated by Burlison. Rickman 876 S.W.2d at 829. Our supreme court has reaffirmed that the trial court "take precautions to ensure that the jury deliberates over the particular charged offense, instead of assembling a 'patchwork verdict' based on the different offenses in evidence." Tidwell v. State, 922 S.W.2d 497, 501 (Tenn. 1996). A primary concern in assuring a unanimous jury verdict is when multiple incidents have occurred, and a general time frame has been drafted in the indictment. Id. "[I]t is quite evident that there is no apparent means to differentiate among various counts of the same offense. Additionally, the indictments provide no means to enable a fact-finder to match a specific conduct to a specific count." Id.

In the case sub judice, the victim testified that she was raped by digital penetration on multiple occasions over a period of years. She stated that the rapes occurred wherever she was living and that they occurred in her bedroom or in the bathroom. Finally, the victim testified that these acts occurred "every day" or "three or four times a week" in 1979, 1980 and 1981. She did not describe any particular event with specificity. We believe that we must consider

this an example of the "grab bag" that our supreme court warned against in Tidwell:

> This approach, in our view, is akin to a "grab-bag" theory of justice. To illustrate the operation of this theory, in any given case the State could present proof on as many offenses within the alleged period as it chose. Because all such offenses will have been "proven," the jury may, in effect, reach into the brimming bag of offenses and pull out one for each count. Even when done by this method, the argument goes, each offense will have been proven beyond a reasonable doubt. We acknowledge that the illustration is an extreme one, but we think it makes the point: such an approach is contrary to our law.

Tidwell, 922 S.W.2d at 501. Here, the victim testified that finger penetration occurred basically all of the time. Without an election, the jury could reason that because the acts occurred all of the time, at least one aggravated rape occurred in each year in question. Under our law, this constitutes reversible error.

We recognize, as the jury surely did, that the Defendant's actions are deplorable examples of domination and abuse. We find the result we must enforce most distasteful. The Defendant is clearly a person who engenders little or no sympathy. However, we note that the State could have perhaps assisted Ms. Bowman, who was an adult at the time of trial, to isolate specific incidents of abuse in the years in question upon which to anchor the convictions. With the proof as it currently exists in the record, we are compelled to grant the Defendant a new trial on the charges for aggravated rape. We simply cannot conclude that the error is harmless beyond a reasonable doubt.

As our supreme court recently again emphasized:

We appreciate the difficulties involved in prosecuting cases of sexual abuse against small children. In such cases, the rules of evidence and the rules of procedure have been relaxed to some extent to accommodate very young witnesses. Nevertheless, the constitutional protections guaranteed a criminal defendant, who is presumed by the law to be innocent until proven guilty, cannot be suspended altogether because of the victim's age or relative inability to testify. In cases such as this one, the state must either limit the testimony of prosecuting witnesses to a single event, or prepare the case so that an election can be made before the matter is submitted to the jury to decide.

Walton, 958 S.W.2d at 728 (quoting Shelton).

Finally, we cannot adequately assess the sufficiency of the evidence because we find that the State failed to elect the offenses upon which to convict the Defendant. The evidence in this record does not assure the jury achieved a unanimous verdict and precludes this Court from effectively reviewing the sufficiency of the convicting evidence as we cannot be certain what evidence was used by the jury to determine guilt on each count. See Tidwell, 922 S.W.2d at 501; Shelton, 851 S.W.2d at 138.

II.

The Defendant also argues that the counts of the indictment alleging aggravated rape are fatally defective for failure to allege the requisite mens rea. The Defendant relies primarily upon the decision of this Court in State v. Roger Dale Hill, C.C.A. No. 01C01-9508-CC-00267, Wayne County, (Tenn. Crim. App., Nashville, June 20, 1996). We first note that this Court's decision in Hill was based upon an interpretation of our new criminal code, and this code is

-20-

applicable only to offenses occurring after November 1, 1989.  Secondly, our supreme court has reversed this Court's decision in Hill.  See State v. Hill, 954 S.W.2d 725 (Tenn. 1997).

In the case sub judice, we have examined the language of the challenged indictment and we conclude that the indictment adequately alleged the criminal offenses charged and sufficiently informed the Defendant of the charges against him such that the convicting court had jurisdiction.  Also, the disposition of the convictions because of the election issue negates the need for further analysis.

III.

As his next issue, the Defendant contends that the trial court erred by failing to grant his motion to sever offenses. The Defendant was indicted on eight counts of aggravated rape which occurred between 1979 and 1985, three counts of assault and two counts of attempted first-degree murder, all of which occurred in 1994. The offenses were consolidated for trial. The Defendant filed a motion to sever counts 1 through 8 and counts 9 through 13 because they were remote in time and unrelated in nature. The Defendant also filed a motion to dismiss counts 4 through 8, which was granted. On the day of the trial, the trial judge stated that he would allow the State to present evidence to connect the offenses, but if they did not, he would grant a severance and a mistrial. The remaining three counts of aggravated rape were tried together with the counts originating from the 1994 incidents.

Under Rule 8(b) of the Tennessee Rules of Criminal Procedure, separate and distinct offenses may be joined in one indictment if (1) the offenses are of the same or similar character or (2) the offenses constitute parts of a common scheme or plan. Under Rule 14(b)(1), a defendant has a right to a severance of offenses joined by Rule 8(b) unless (1) the offenses are part of a common scheme or plan and (2) the evidence of one would be admissible upon the trial of the others. Tenn. R. Crim. P. 14(b)(1).

We must first determine whether the offenses that were tried together constitute a common scheme or plan. A common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes. State v. Hoyt, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995) State v. Hallock, 875 S.W.2d 285, 289-90 (Tenn. Crim. App. 1993) (citing State v. Peacock, 638 S.W.2d 837 (Tenn. Crim. App. 1982)). There are three categories of "common scheme or plan" evidence. These include (1) distinctive designs, or signature crimes; (2) a larger, continuing plan or conspiracy; and (3) the same transaction. Hoyt, 928 S.W.2d at 943. A continuing plan of conspiracy "involves not the similarity between the crimes, but the common goal or purpose at which they are directed." Id. (citation omitted). In such circumstances, the proof sought is of a working plan, operating towards the future with such force as to make probable the crime for which the defendant is on trial." Id.

In the case at bar, the proof demonstrated that the Defendant dominated the victim's family from the time he became involved with them. He began to use Nicole Bowman as his sexual "property" and molested her from as early as the age of three until the time of the offenses that occurred in 1994. Nicole would be forced to stay at home alone with the Defendant when her sister was allowed to leave with her mother. He exerted control over the victim even after he moved out of her home when she was thirteen. The Defendant demanded that she come to his house so he could continue to molest her. He demanded money from Teresa Bowman, and was the disciplinarian to her children, whether or not he was the biological father. When Nicole Bowman began to work, the

-23-

Defendant demanded money from her. He required her to be accessible at all times. Nicole had no social life and did not date. When she was eighteen, the Defendant found out that she was dating a boy and that she had had sexual relations with him. The Defendant became enraged, assaulted the victim, and then forced vaginal intercourse with her.

The victim graduated from high school and then worked full time. Evidence established that the Defendant continued to dominate his "possession." He cosigned for a car but forced Nicole to keep it at his house. She had to surrender her wages to the Defendant, who used them to pay for his own car. She had a pager and could only use her car to drive to and from work and to church on Sunday. She was expected to account for her whereabouts at all times. She still had no social or dating relationships. When Nicole began seeing Claude Rucker, she became more courageous and cooperated less frequently. She had to see Mr. Rucker secretly during a free hour she had after her work shift ended and before her sister's shift ended. When she left her mother's house, at age twenty-one, the Defendant attempted to force her in his vehicle to make her return home. After the Defendant discovered she was seeing Claude Rucker, he became enraged. He stalked the two and warned them that he would shoot them down "like dogs." His desire to control Nicole Bowman culminated in his shooting her and Claude Rucker as they sat in Rucker's car outside his house.

Although the offenses tried together were indeed remote in time, the evidence in the record reveals that the offenses committed by the Defendant

were perpetrated as a result of his goal to sexually molest and completely dominate Nicole Bowman for his own gratification. See State v. Bomar, C.C.A. No. 85-81-III, Davidson County (Tenn. Crim. App., Nashville, Nov. 27, 1985) perm. to appeal denied (Tenn. 1986).

We must next consider whether the evidence of the aggravated rapes would properly be admitted in the trial for the assaults and attempted murders. Evidence that the accused committed crimes independent of those for which he is on trial is generally inadmissible because such evidence lacks relevance and invites the finder of fact to infer guilt from propensity. Tenn. R. Evid. 404(b). However, evidence of other crimes, wrongs, or acts may be admissible for other purposes. 404(b). For example, when a prior bad act reveals a defendant's motive or intent, shows a common scheme or plan, or rebuts a defendant's theory that the charged offense was an accident or mistake, the trial court may admit evidence of the prior bad act after holding a hearing out of the jury's presence. At the hearing the trial judge must weigh the probative value of the evidence against possible unfair prejudice to the defendant. Tenn. R. Evid. 404(b); State v. West, 844 S.W.2d 144, 149 (Tenn. 1992).

In the case sub judice, the trial court ruled the evidence of the prior acts to be admissible at trial. The evidence of the history of sexual abuse was admitted not to prove the Defendant acted in accord with this character but as part of the proof establishing his motive for the assaults and attempted murders. See State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993). The Defendant claimed that the

assaults occurred only because he was trying to mediate an argument between Nicole Bowman and her mother. He went to her place of employment to take her home at her mother's behest. He also claimed that his actions taken to control Nicole were for her own protection. The Defendant suggested that Claude Rucker had threatened the Defendant to leave Nicole alone because Rucker was with her now. The Defendant testified that he only shot at Claude Rucker's car because he thought Rucker was reaching for a gun. The State's proof and the Defendant's explanations were clearly contradictory and motive was certainly an issue in proving the level of intent for attempted first-degree murder. Proof of the nature of the relationship between the victim of a violent crime and a defendant prior to the commission of the offense are relevant to show defendant's hostility and a settled purpose to harm the victim. See Smith, 868 S.W.2d at 574; State v. Turnbill, 640 S.W.2d 40, 46-47 (Tenn. Crim. App. 1982); State v. Glebock, 616 S.W.2d 897, 905-906 (Tenn. Crim. App. 1981). We do not believe that the probative value of this evidence is outweighed by the danger of unfair prejudice.

Therefore, we cannot conclude that the trial court erred by failing to grant the Defendant's motion to sever.

IV.

As his final issue, the Defendant contends that the trial court erred in its application of enhancement factors for the two attempted first-degree murder convictions and in imposing consecutive sentences. When an accused

challenges the length, range, or the manner of service of a sentence, this court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In conducting a de novo review of a sentence, this court must consider: (a) the evidence, if any, received at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement that the defendant made on his own behalf; and (g) the potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, and -210; see State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The trial court sentenced the Defendant to twenty-five year sentences for each attempted first-degree murder conviction. The trial court found the following sentence enhancement factors applicable to count twelve, the attempted murder of Nicole Bowman: (1) That the Defendant has a previous history of criminal behavior in addition to those acts necessary to establish the appropriate range; (6) that the personal injuries inflicted upon the victim were particularly great; and (9) that the defendant possessed a firearm in the commission of the offense. Tenn. Code Ann. § 40-35-114(1),(6),(9). On count thirteen, the attempted murder of Claude Rucker, the trial court applied enhancement factors (1), (9) and (10) that the defendant had no hesitation about committing a crime when the risk to human life was high. Tenn. Code Ann. § 40-35-114(1), (9), (10). The trial court found no mitigating factors.

The Defendant argues that enhancement factor (6) does not apply to the sentence in count twelve because it is an element of attempted first-degree murder. We disagree. This Court has held that it is appropriate to apply enhancement factor (6) to attempted first-degree murder because the offense may be committed without causing any injury and thus, is not an essential element of the offense. State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995); State v. Archie Lee Roberts, C.C.A. No. 01C01-9603-CC-00082, Dekalb County (Tenn. Crim. App., Nashville, Jan. 30, 1997) perm. to appeal denied (Tenn. 1997); State v. Tim Fox, C.C.A. No. 03C01-9503-CR-00061, Sevier County (Tenn. Crim. App., Knoxville, June 21, 1996). Here, the injuries to Nicole

Bowman included extended hospitalization, severe facial disfiguration and the loss of vision in one eye.

Next, the Defendant argues that the trial court misapplied factor (10) to count thirteen because there were no bystanders during the commission of the offense and that he was convicted based on both victims. The State counters that the Defendant shot Nicole Bowman, then shot Claude Rucker. Because Nicole was leaning against Rucker when the Defendant shot the second time, this put her further at risk, supporting the imposition of factor (10). Ordinarily, factor (10) may not be applied when it is an essential element of the offense. It has been considered such in charges for attempted murder because the offense constitutes behavior that is inherently a high risk to human life. State v. Makoka, 885 S.W.2d 366, 373 (Tenn. Crim. App. 1994); However, when others who are not the victims of the crime are at risk of harm, this factor may be applied. Id.; State v. Hicks, 868 S.W.2d 729, 732 (Tenn. Crim. App. 1993). In the case at bar, the Defendant was charged with attempted first-degree murder for both victims involved. Therefore, the high risk to human life was clearly inherent in the charged offenses. The fact that Nicole Bowman was near Claude Rucker when the second shot was fired does not create a risk that was a "second time around" that would justify a finding of risk of harm above and beyond that inherent in the offense of attempted first-degree murder. Furthermore, there is no evidence that any witnesses to the event were in close enough proximity to the shootings to be considered at risk because of the offense. We must conclude that the trial court erred in applying factor (10) to count thirteen, the attempted murder of Claude

Rucker. Nevertheless, we believe that the remaining enhancement factors more than adequately support the twenty-five year sentence imposed by the trial court. Likewise, we affirm the twenty-five year sentence imposed for the attempted murder of Nicole Bowman.

The Defendant also charges that the trial court erred by ordering him to serve his sentences for the attempted first-degree murders consecutively. The trial court found that the Defendant was a dangerous offender, which requires that an offender's "behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). Beyond this, the evidence must support "the finding that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995); see State v. Taylor, 739 S.W.2d 227, 230 (Tenn. 1987); Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976).

The trial court found that the Defendant was a dangerous offender and we agree. Tenn. Code Ann. § 40-35-115(4). He had no hesitation about committing a crime in which the risk to human life was high. The circumstances surrounding the offenses were aggravated in every sense. Furthermore, the trial court found, considering the principles enumerated in Wilkerson, that the sentences reasonably related to the severity of the offenses and that an extended period of incarceration was necessary to protect the public.

The Defendant argues that he had only one prior aggravated assault and that this is not enough to support consecutive sentences. We have no reservations in finding that the trial court properly sentenced the Defendant to consecutive terms. In addition to his prior conviction, the Defendant exhibited a long-term pattern of abusive and controlling behavior not only in regard to the victim, Nicole Bowman, but her entire family. The Defendant had no hesitation in threatening and attacking Ms. Bowman and whoever else interfered with his purpose to control her. The Defendant was unrepentant at trial and claimed that the other witnesses lied about him. There is no indication that when the Defendant is released, he will refrain from engaging in the same destructive behaviors for which he has been incarcerated. Therefore, we affirm the trial court's imposition of consecutive twenty-five year terms. The sentences for assault remain concurrent as ordered by the trial court for an effective sentence of fifty years.

Accordingly, we affirm the Defendant's convictions for assault and attempted first-degree murder and the effective fifty-year sentence ordered therefor. We reverse the convictions for aggravated rape and remand for a new trial.

_____
DAVID H. WELLES, JUDGE

-31-

CONCUR:

_____
JERRY L. SMITH, JUDGE


_____
THOMAS T. WOODALL, JUDGE