# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs February 5, 2008

## STATE OF TENNESSEE v. ROBERT RUBIN

**Appeal from the Criminal Court for Shelby County**
**No. 04-03615     John P. Colton, Jr., Judge**

---

**No. W2007-00907-CCA-R3-CD  - Filed July 8, 2008**

---

The defendant, Robert Rubin, was convicted by a Shelby County Criminal Court jury of the first degree murder of Michael Gross.  He was also convicted of the attempted first degree murder of Charles Gross, a Class A felony.  The defendant is serving consecutive sentences of life for the first degree murder conviction and thirty-five years for the attempted first degree murder conviction.  In this direct appeal, the defendant contends (1) that the evidence is insufficient to convict him of first degree murder, and (2) that the trial court erred in sentencing him to a thirty-five year term for attempted first degree murder and in imposing the sentences consecutively.  We hold that no error has been shown, and we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Robert Wilson Jones, District Public Defender; Garland Ingram Erguden (on appeal) and Michael J. Johnson and Jane Sturdivant (at trial), Assistant Public Defenders, for the appellant, Robert Rubin.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Patience R. Branham and Rachel Newton, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

At the trial, Shirley Wilson testified that the victims, Michael Gross and Charles Gross, were her brothers.  She said that on November 15, 2003, her nephew, David Hillard, got married and that she attended a celebration at Hillard's sister Amy's apartment.  She said she arrived between 8:00 and 8:30 p.m. and left with her fiancé, Prentice Well, at 10:30 or 11:00 p.m.  She said that Michael and Charles were there and that Michael had just awakened.  She said the celebrants had not yet started drinking while she was there.  She said Amy, Charles, David, David's wife Delores, and two other people went out to clubs that evening, but she did not.  After she was home and asleep in bed,

her son informed her that Michael had been shot. She attempted to go to the place where he was shot, but she was not permitted access.

David Hillard testified that Michael Gross was his uncle and Charles Gross was his father. He said he was married on the day in question. He and his wife celebrated with a group at his sister Amy's apartment that afternoon and evening, where they were drinking whiskey. He said his Uncle Michael became so intoxicated that he and his father put Michael to bed. He said that he and his wife went to a club at about 9:00 or 10:00 p.m. with Amy, Charles, "Christy," and "Alisha," that they continued drinking whiskey at the club, and that he and his wife left about 1:30 a.m. He said Michael stayed at Amy's apartment in bed. He said that he did not know the defendant and that the defendant did not go to the club with the group.

Amy Hillard testified that at the time of the offenses, her next-door neighbor was Christy Stokes. She said Stokes and the defendant were dating. She identified Alisha Farmer as the defendant's daughter. She said Farmer had been at her house for the marital celebration and had gone to the club with them. She said they left the club around 2:30 a.m. She said Michael was waking up as she arrived home. She said that Stokes went to her own apartment and Farmer went to Hillard's apartment. She said that Farmer later went to Stokes' apartment and that eventually, both Stokes and Farmer returned to Hillard's apartment. She said that Farmer returned with a bloody nose and that Farmer went outside. She said that when Charles saw Farmer's bloody nose, he got off the couch and went outside. She said Michael went outside, also. She heard arguing and fighting outside and then heard two gunshots about fifteen to twenty minutes after the argument. She acknowledged that she had given a statement to the police shortly after the offenses in which she said she heard shots five or ten minutes after the argument.

Charles Gross testified that Michael Gross was his brother. He said that on November 15, 2003, he had gone out with the group to celebrate his nephew's wedding. He said he did not know the defendant before that night. He said he had only one beer and no whiskey that evening. He said that he went to Ms. Hillard's apartment from the club and that his brother Michael was just waking up. He said that Farmer and Stokes came to Hillard's apartment and that one of them was crying and the other had a bloody nose or mouth. He said Farmer went outside to talk to the defendant and that he went outside and tried to stop an argument between the two of them. He said that he was trying to get Farmer away from the defendant and that when he had his head turned to the side, the defendant hit him, which started a fight that lasted "a few minutes." He said that he was about six feet tall and that at the time of the fight, he weighed about 245 or 250 pounds. He said that Stokes and Michael came outside and that Michael said, "Ya'll stop. This is my brother." He said Michael attempted to block the two men from fighting. He said Michael was about five feet, nine inches tall and weighed about 200 pounds. He said that he did not know whether Michael hit the defendant but that he and the defendant stopped fighting. He said that the defendant was on the ground at this point and that the defendant ran away.

Mr. Gross testified that he and his brother went back to Hillard's apartment. He said his brother wanted to go to Mr. Gross's house to spend the night and that they left about ten minutes

after returning to the apartment. He said that as they got into the parking lot, they saw the defendant raise his hand and they ran in opposite directions. He said he was hit in the arm and then hid. He heard a second shot. He said that about ten minutes later, he heard about three or four more shots. He did not see what happened to his brother. He said he did not know whether the defendant intended to kill him.

Mr. Gross acknowledged that his brother had so much to drink at Ms. Hillard's apartment that he was unable to go to the club with the group and stayed behind to sleep and recover from his drinking. He denied that the defendant's shirt came off when he slung him to the ground by his shirt collar but acknowledged that his memory was better hours after the incident when he gave a statement to the police to this effect. He admitted that he had said in his previous statement that only about three minutes elapsed between the fight and the shooting. He admitted that he was sorry he fought with the defendant over the defendant's domestic dispute because his doing so cost Michael Gross his life.

David Yates testified that at the time of the offenses, he was working as a security guard at the apartment complex that included the crime scene. He said he heard but did not see arguing, about a minute or two of silence, and then shots. He said he saw someone on the ground and another person standing above the person with a gun pointed down. He said he saw the last shot being fired into the victim's motionless body. He said that he identified himself but that he saw the hand of the person with the gun coming up and that he ran away. He called the authorities.

Lieutenant Donald Crowe of the Memphis Police Department testified that he and Sergeant Locastro were driving past the scene of the offenses when a report of shots having been fired was broadcast on his radio and that he responded to the scene, where he encountered David Yates. He said it was about 3:30 a.m. He said Yates indicated the direction where the shooting occurred and where the suspect was. Sergeant Locastro captured the suspect, and Lieutenant Crowe located the victim, whom he determined had no pulse and whose pupils were not reactive to light. He said the police found blood spots on the steps of an apartment and a shell casing on the sidewalk between that apartment and another. They did not recover a weapon at the scene. He took a statement from Charles Gross after finishing his investigation at the scene.

Lieutenant Joseph Locastro testified that he and Lieutenant Crowe were two or three blocks from the scene and responded to a radio report. He said that a witness gave them a description of the suspect and that they saw a person matching that description running away. He chased and apprehended the person and took him into custody. He said that as a result of information the police received, he went to an apartment and found a blue gym bag containing a box of Blazer .38 caliber ammunition and a spent casing. He said he did not strike the defendant in the process of arresting him.

Officer David Galloway of the Memphis Police Department testified that he was part of the crime scene investigation unit that processed the scene of the offenses. He identified various items recovered, including a spent shell casing, a Blazer box, and a bag of .38 caliber ammunition.

Officer Michael Hill of the Memphis Police Department testified that he was part of the crime scene investigation unit that collected evidence. He prepared sketches of the scene depicting the location of the items of evidence and the victim. He identified the sketches, as well as photographs of the scene.

Detective John Pasley of the Memphis Police Department testified that he was the lead investigator. He identified numerous exhibits, including items of physical evidence collected and photographs which depicted the scene, the evidence collected, the injuries to the victims, and the defendant.

Special Agent Teri Arney of the Tennessee Bureau of Investigation testified that she examined bullets recovered by the medical examiner from Michael Gross's body. She identified them as .38 caliber and having been fired from a .38 caliber or .357 revolver. She concluded that two of the bullets had been fired from the same weapon, but a third bullet was too mutilated for her to make that comparison to the others.

Doctor O'Brian Cleary Smith testified as an expert witness in forensic pathology that he performed the autopsy of Michael Gross and determined that this victim died as a result of multiple gunshot wounds. He said the victim had five wounds from four bullets. He said three of the entrance wounds were on the front of the body and the fourth was on the back. He examined the victim's clothing and determined that blood had dripped from the wounds in the upper torso down the front of the victim's pants legs and on the tops and sides, but not the soles, of the victim's shoes. He stated that this indicated the victim was upright and moving forward, rather than stationary, as he bled. He said one of the bullets struck the victim's spinal cord and would have caused the victim to lose use of his legs immediately. He said the gunshot wounds appeared to have been distant, meaning they were inflicted by a bullet fired from more than two feet away. He said he retrieved three bullets from the victim's body. He said that Michael Gross's blood alcohol level was .155 grams per decaliter, which he said was approximately two times the presumed level of intoxication for driving.

The defendant chose not to testify on his own behalf or present any other evidence. After considering the evidence, the jury found the defendant guilty of first degree murder of Michael Gross and guilty of attempted first degree murder of Charles Gross. The trial court sentenced the defendant to life for the first degree murder conviction and to thirty-five years as a Range II offender for the attempted first degree murder conviction. The court found that the defendant was a dangerous offender and imposed the sentences consecutively. This appeal followed.

**I**

In his first issue, the defendant challenges the sufficiency of the convicting evidence of his first degree murder conviction. Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond

a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

As relevant here, first degree murder is an unlawful "premeditated and intentional killing of another[.]" T.C.A. §§ 39-13-201; -202(a)(1).

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our supreme court has noted many factors tending to support the existence of premeditation, including: "the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing." State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000). Without sufficient evidence of premeditation, a homicide in Tennessee is presumed to be second degree murder. State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). "'Intentional' means that a person acts intentionally with respect to . . . a result of the conduct when it is the person's conscious objective or desire to . . . cause the result." T.C.A. § 39-11-106(a)(18).

The defendant claims that the evidence establishes that he is guilty of no offense greater than voluntary manslaughter or second degree murder. He argues that the offense occurred when both the defendant and the victim were intoxicated, that Charles Gross interjected himself into a family fight between the defendant and his daughter, that Charles Gross was unprovoked but threw the first punch and got the better of the defendant in the ensuing fight, and that the defendant retrieved a gun in "a seamless continuation of events" and shot Michael Gross. The defendant's argument overlooks the actual facts of the case as well as the applicable legal standard on appeal.

We note, first of all, that the undisputed proof is that the defendant landed the first blow in the fight with Charles Gross. Further, accepting the defendant's characterization of the facts would require us to overlook the legal requirement that we view the evidence in the light most favorable to the state. Accepting the evidence from the state's perspective, the defendant and Charles Gross were involved in a fight after Charles Gross attempted to separate the defendant and his daughter from an altercation. Michael Gross attempted to stop the fight between his brother and the

-5-

defendant, and Charles Gross got the better of the defendant in the fight. The Grosses went inside after the fight for a short period of time, and the defendant went to another apartment and retrieved a gun. The Grosses went outside to get into a car and leave when the defendant fired shots, striking both of them. Michael Gross was struck four times, and by the end of the attack, the defendant was standing over Michael Gross firing into his body. There was a period of time between the end of the fight and the shooting of at least a minute or two but possibly as long as fifteen to twenty minutes. The evidence demonstrates that the defendant was able to get away from the fight with Charles Gross, but instead of staying in the safety of the apartment to which he fled, he retrieved a gun and shot both of the Grosses later as they were attempting to leave the apartment complex. The evidence is sufficient to support the defendant's conviction of an unlawful, intentional, and premeditated killing.

## II

The defendant also claims that he was improperly sentenced to an enhanced sentence and to consecutive sentencing. He argues that the trial court relied upon two inappropriate enhancement factors and that consecutive sentencing is not supported by the evidence of record. He also argues that the increased and consecutive sentences were imposed in violation of State v. Gomez, 239 S.W.3d 733 (Tenn. 2007), because application of the enhancement factors found by the judge, rather than a jury, deprived him of his right to jury trial. He acknowledges that this issue was not raised at trial but argues that he is entitled to plain error relief under the Gomez decision. The state concedes that the trial court erred in applying two enhancement factors but argues that the defendant has not demonstrated plain error in the length of his attempted first degree murder sentence. The state also argues that the trial court made proper oral and written findings to support its imposition of consecutive sentencing on the basis the defendant was a dangerous offender.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d).[1] As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing

---

[1]We note that on June 7, 2005, the General Assembly amended Tennessee Code Annotated sections 40-35-102(6), -114, -210, -401. See 2005 Tenn. Pub. Acts ch. 353, §§ 1, 5, 6, 8. However, the amended code sections are inapplicable to the defendant's appeal. The defendant was sentenced after the change in the sentencing laws took effect, but the record does not reflect that the defendant signed a waiver of their ex post facto protections to be sentenced under the amended provisions. See T.C.A. § 40-35-210, Compiler's Notes.

principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his or her own behalf, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

## A.    Length of Sentence for Attempted First Degree Murder

With respect to the defendant's attempted first degree murder conviction, the defendant was a Range II offender facing a sentence of twenty-five to forty years for this Class A felony. See T.C.A. § 40-35-112(b)(1). The trial court applied enhancement factors on the basis that the defendant had "a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range"; "[t]he offense involved more than one victim"; and "[t]he defendant had no hesitation about committing a crime when the risk to human life was high[.]" See T.C.A. § 40-35-114(2), (4), (11) (2003). We agree with the parties that the trial court erred in applying the factors for multiple victims and the defendant's lacking hesitation to commit the crime when the risk to human life was high. See State v. Freeman, 943 S.W.2d 25, 31 (Tenn. Crim. App. 1996) (holding that factor did not apply when defendant was charged and convicted of separate convictions for each victim) (cited with approval by State v. Reid, 943 S.W.2d 247, 311 (Tenn. 2002); State v. Butler, 900 S.W.2d 305, 313-14 (Tenn. Crim. App. 1994) (holding that factor involving lack of hesitation did not apply to offense of second degree murder); cf. State v. Makoka, 885 S.W.2d 366, 373 (Tenn. Crim. App. 1994) (holding that lack of hesitation factor could be applied where there was proof that individuals other than the victim were present and placed in peril), questioned on other grounds by Freeman, 943 S.W.2d at 31-32.

Notwithstanding the trial court's error in applying two enhancement factors, the court properly applied the enhancement factor for the defendant's prior criminal convictions. The presentence report reflects that, in addition to the felony convictions which qualified him for Range II sentencing, the defendant had numerous misdemeanor convictions for assault, driving offenses, drug offenses, and malicious mischief. Although the defendant's last conviction was several years

before his present offenses, his history of criminal convictions demonstrates an alarming pattern of illegal activity during much of his adult life. Upon de novo review, we conclude that on the basis of the defendant's criminal convictions alone, he was deserving of a thirty-five year sentence. Moreover, sentencing on the basis of prior criminal convictions without a jury determination does not run afoul of the Sixth Amendment. Blakely v. Washington, 542 U.S. 296, 301, 124 S. Ct. 2531, 2536 (2004); Apprendi v. New Jersey, 530 U.S. 466, 489,120 S. Ct. 2348, 2362-63 (2000). Because we have concluded that the trial court's imposition of a thirty-five year sentence was proper based upon the facts of the case and applicable precedent regarding judicial fact-finding of enhancement factors, it is not necessary for us to conduct a plain error review.

**B.      Consecutive Sentencing**

The remaining issue is that of consecutive sentencing. We begin by noting that the Tennessee Supreme Court has recently concluded that jury fact-finding in consecutive sentencing determinations is not constitutionally required. See State v. Anthony Allen, ___ S.W.3d ___, No. W2006-01080-SC-R11-CD, Shelby County (Tenn. June 24, 2008). Thus, the defendant's claim of Gomez sentencing error is of no consequence in our consideration of this issue.

Consecutive sentencing is guided by Tennessee Code Annotated section 40-35-115(b), which states in pertinent part that the court may order sentences to run consecutively if it finds by a preponderance of the evidence that the defendant is a "dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(4). For dangerous offenders, "consecutive sentences cannot be imposed unless the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995); see State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). Rule 32(c)(1) of the Tennessee Rules of Criminal Procedure requires that the trial court "specifically recite the reasons" behind its imposition of a consecutive sentence. See State v. Donnie Thompson, No. M2002-01499-CCA-R3-CD, Maury County, slip op. at 5 (Tenn. Crim. App. Mar. 3, 2003) (reversing the trial court's imposition of consecutive sentencing because it failed to make a finding under Tennessee Code Annotated section 40-35-115(b) and the record did not support a conclusion that the defendant met the consecutive sentencing prerequisites).

The court made the following findings in classifying the defendant as a dangerous offender:

> [T]he reason for the consecutive sentence is this man's been . . . arrested since 1980 twenty-three times, and he's ended up here – even though some of these were a while back, he's ended up here now killing one person and hurting another by shooting a gun at them, and the Court finds that he's a danger to society for doing that.

In its written findings, the court found:

The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high; and all three of the following factors apply:

> (a) the circumstances surrounding the commission of the offense are aggravated,
> (b) confinement for an extended period of time is necessary to protect society from the defendant's unwillingness to lead a productive life and the defendant's resort to criminal activity in furtherance of an anti-societal lifestyle, and
> (c) the aggregate length of the sentences reasonably relates to the offense of which the defendant stands convicted.

The defendant argues that his convictions are from an earlier time in his life and that he has been a productive member of society as evidenced by his continuous employment from 1992 until 2003. This evidence was before the trial court, yet it afforded greater consideration to the defendant's lengthy criminal history and the egregious circumstances of the present offenses. We believe that the defendant's argument is somewhat diminished by evidence that he continued to receive criminal convictions during the first few years of his employment and that he resigned from this job six months before committing the present offenses. Upon our de novo review, we hold that the trial court made proper findings and did not err in imposing consecutive sentences. The court properly relied on the defendant's protracted criminal history and his use of a weapon against multiple victims in the present offenses. The trial court properly determined that the defendant was an offender who was deserving of an extended sentence.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE